UNITED STATES, Appellee

v

LEMUEL KING, Sergeant First Class,
U. S. Army, Appellant

11 USCMA 19, 28 CMR 243

No. 12,981

Decided November 20, 1959

*Miss Madeline DeFina* was on the brief for Appellant, Accused.
*Lieutenant Colonel James G. McConaughy* and *First Lieutenant Allen I. Saeks* were on the brief for Appellee, United States.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The facts in this case show a deceitful and fantastic scheme and, while the accused defrauded the United States Government, the issue before us is whether jurisdiction to try him for his offenses vested in a military court. We express no opinion as to the right of the Government to proceed in other forums, but we are constrained to hold that the accused was not triable by a court-martial.

Briefly stated, the facts disclose that on February 18, 1958, accused, then a Private E–1, was separated from the Army by means of an undesirable discharge, and he reverted to a civilian status. Some three days thereafter, with the asserted connivance of a member of Headquarters, United States Army Training Center, Infantry, and Fort Ord, California, orders were obtained by him purporting to authorize his shipment to Europe via Fort Dix, New Jersey, in the grade of master sergeant. Pursuant to these orders, the accused proceeded from Fort Ord, California, to Fort Dix, New Jersey. In the course of his travels between these two places, he applied for and received $194 in advance travel pay and $75 in partial pay. Upon his arrival at the latter station on March 22, 1958, he presented the false orders to the military authorities, and the United States Army Overseas Replacement Station, Fort Dix, New Jersey, relying on the documents, carried him as a member of the Army on a morning report for March 22, 1958. On March 25, 1958, travel orders were issued, and he was shipped to Germany. Upon arrival in that country, he was assigned to Headquarters Company, V Corps, and detailed with the Quartermaster Section in the food service field. He received pay and allowances from the United States Army from March 22, 1958, until he committed certain offenses on or about July 25, 1958, and we assume that at that time these payments ceased. Subsequent to the latter date he was charged with and tried for six separate offenses which, stated generally, were these: Fraudulent enlistment, absence without leave, failure to obey a lawful order, resisting apprehension, forgery, and possession of a false pass. At the time of arraignment, he moved to dismiss the specifications upon the grounds that he was a civilian and not a person subject to the Uniform Code of Military Justice. After the foregoing facts were brought to the attention of the law officer in an out-of-court hearing and counsel were afforded the opportunity of arguing their respective hypotheses, the law officer denied the motion. Thereupon, accused entered a plea of guilty, was convicted and sentenced by the court-martial to be dishonorably discharged from the service, to forfeit all pay and allowances and to be confined at hard labor for five years. The convening authority reduced the period of

**22**

confinement to one year but otherwise approved the sentence, and while the board of review set aside the conviction for forgery, it affirmed the remaining findings and the sentence. We granted accused's petition for review on several grounds, but our holding that the accused was not subject to military law disposes effectively of all questions raised.

The theory relied on by the Government and the one used by lower reviewing authorities to support jurisdiction was that the accused constructively enlisted by voluntarily entering the Army and by receiving pay and allowances from that service. That is a firm principle, but we fail to conceive how it can be applied in this instance.

As a starting point, we refer to the well-recognized work of Colonel Winthrop. On page 733 of his Military Law and Precedents, 2d ed, 1920 Reprint, he states:

"FRAUDULENT ENLISTMENT. By the recent enactment of July 27, 1892 ch. 272, sec. 3, it was provided— *That fraudulent enlistment, and the receipt of any pay or allowance thereunder, is hereby declared a military offence, and made punishable by court-martial under the 62d Article of War.'*

"Nature of The Offence. Prior to this legislation, fraudulent enlistment was not, in the opinion of the author, triable by court-martial, for the reason that the fraudulent representations, &c., in which the offence consisted must have been preliminary and made as an inducement to the enlistment, and so before it was consummated, and while therefore the individual was still a *civilian* and not constitutionally amenable to such trial. A statute assuming to make mere fraudulent enlistment so triable would not remove the objection, since a statute cannot do away with a constitutional incapacity or confer jurisdiction where the constitution denies it. But the receipt of 'pay' or an 'allowance' under an enlistment knowingly fraudulent *is* an offence, because the pay, &c., is not received till the enlistment has been completed

and the party is actually in the military service. It is thus the receipt of pay or of an allowance, (as an allowance of clothing or rations, for it is not considered that 'allowance' means necessarily pecuniary allowance,) which is the gist of the legal offence and which in fact constitutes it. A person who has procured himself to be enlisted by means of false representations as to his status is not, *before* having received pay or an allowance, or *until* he receives one or the other, amenable to military trial. And the Act would be more correctly worded thus—*The receipt of any pay or allowance under a fraudulent enlistment is hereby declared, &c."*

In the next paragraph he defines fraudulent enlistment as follows:

". . . And the offence is officially defined as follows—'A fraudulent enlistment is an enlistment procured by means of a wilful misrepresentation in regard to a qualification or disqualification for enlistment, or by an intentional concealment of a disqualification, which has had the effect of causing the enlistment of a man not qualified to be a soldier, and who, but for such false representation or concealment, would have been rejected.' "

Article 83 (1) of the Uniform Code of Military Justice, 10 USC § 883, which is controlling in the instant case, differs little from the quoted definition, as it provides for the punishment of:

"Any person who—

(1) procures his own enlistment or appointment in the armed forces by knowingly false representation or deliberate concealment as to his qualifications for that enlistment or appointment and receives pay or allowances thereunder; . . ."

It is undisputed that the accused received pay and allowances, so the only question involved is whether his fraudulent representations or concealments procured his own enlistment in the Army. It is this ingredient of the crime which, as we view the facts, was not and cannot be established.

In developing our views, we must

**23**

first look to the meaning of the word enlistment to ascertain if �but there was a voluntary entry into the Army. In Webster's New International Dictionary, Second Edition, enlist is defined as follows: "To enroll and bind oneself for military or naval service; as, to *enlist* in the army for the war." In Army Regulations 320–5, we find the following definition of enlistment:

"The voluntary enrollment for a specific term of service in one of the Armed Forces, as contrasted with induction under the Universal Military Training and Service Act of 1948, as amended."

Certainly, when we measure the facts of this case by those definitions, the accused did not voluntarily enroll in the Army. At best, all he did was to put on the garb of a soldier and masquerade as a member of the Army in good standing. He did not solicit anyone in authority to initiate steps which would result in his enrollment. He and the Government did not enter into any sort of a contract which would change his status for he merely impersonated a member of the Army, and that service was misled by the impersonation and not by any mutual understanding with the accused. By analogy, we suggest that if a civilian reported into the Military District of Washington under the guise of being an officer and he obtained monies by virtue of his guile, he would not have procured an appointment as an officer. Surely he would be guilty of some offense against the Government but not one which required proof that he fraudulently induced a service to appoint him a commissioned officer.

Admittedly, the question poses some difficulties, for it is obvious that when the accused used the forged orders he intended to procure some of the benefits which are secured to enlisted men. However, as Colonel Winthrop pointed out in his treatise, supra, fraudulent enlistment requires two separate and distinct acts and the receipt of pay and allowances is usually subsequent to the execu-

tion of a contract. Moreover, monies and benefits can be obtained when any civilian successfully poses as a serviceman and moves about with a particular service. In the case at bar, the accused fraudulently concealed that he had been separated from the Army by means of an undesirable discharge and the orders he presented were fictitious. While the fraudulent concealments aided his scheme to be shipped overseas, they did not procure an enlistment contract. At this point, it might be helpful to point out that there is a difference between procuring an enlistment contract by false representation and accepting its benefits after it has been executed. Procure means to induce or prevail upon another to perform a desired act, and the record is barren of any evidence suggesting remotely that the Army was prevailed upon to enter into any oral or written agreement by which accused changed his status. There was no offer by him and no acceptance by the Army. The most that can be said in that regard is that the accused induced certain units to make entries in their morning reports showing him to be a member of the responsible commands. Absent evidence to the contrary, these entries might be sufficient to establish membership in the Army, but here the facts indubitably rebut that possibility.

Without going into all the preliminary details of an enlistment contract, we point out that not one single step required by that form of entry into a service was taken. Neither party intended to be bound by a contract. The accused did not solicit enlistment, he was not interviewed, he furnished no false information to a recruiting official, no papers were prepared, no term of service was contemplated, no conditions were agreed upon, no physical examination was given, no oath was given, and, unless the subsequent obtaining of benefits by the accused could change his status from civilian to soldier, there is nothing in this record to suggest any essentials of an enlistment contract.

That brings us to the question of a constructive contract of enlistment and,

to support that theory, the Government cites a great many Headnote 5 authorities. They are appropriate for the principle they announce, but they are inapposite to the present facts. In every cited case and others which we have considered, there was either a completed contract which could be vitiated by the service because of fraud on the part of the applicant or ratified by the service, regardless of the fraud; or, the preliminary arrangements had proceeded far enough that there was a metting of the minds on the essentials of a contract, and both parties were bound by its express or implied terms. In most instances, the individual enlisted in fact and thereby sought to obtain the benefits flowing to a serviceman. In addition, the misrepresentations to the persons authorized to recruit enlistees caused the Government to agree to accept the applicants as members of the military community. The theory underlying those decisions is that there was a contract voidable by the service because a false representation had been made, but accused could not take advantage of his fraud to escape its terms. However, had the representations been true, the service involved would have been bound to accept the individual involved and he would have been obligated to serve for a specified period of time. One of the cardinal principles of contract law is ▪▪▪ that to change a status there must be a mutual understanding of the parties, and here there were no actual terms and conditions contemplated or agreed upon by them which remotely suggested a change in relationship. Accordingly, there is no framework from which to start the construction of a contract bringing about that result.

Obviously, there are instances where courts have held that the acts of the parties created a constructive enlistment. Usually that doctrine is applied where the parties have mutually agreed to change the applicant's status and subsequently he seeks to escape his obligations by asserting that the original agreement to change his status should be rejected because of his own fraud. It is in that sort of situation where constructive contracts find their roots for, in law, constructive means a condition assumed from other acts or conditions which are considered as amounting to or involving the act or condition assumed. Therefore, to find a constructive enlistment in this case, we would be required to assume that the accused became a soldier and that he was accepted by the Army as such merely because he posed as a serviceman and defrauded the Government. Here, the thrust of the Government's argument is that the status was changed solely by accused's fraud in illegally obtaining money, foodstuffs, and other benefits; but such is not the law. Constructive contracts are imposed or created by law without regard to the party bound on the ground that they are dictated by reason and justice. They rest solely on a legal fiction and are not contract obligations at all in the true sense. They are predicated on the hypothesis that whatsoever it is certain that a man ought to do, the law supposes him to have promised to do. But the supposition cannot be expanded to the extent that criminal acts amount to enlistments and based on that premise a contract is constructed which is inimical to the interest of the innocent party. To construe the acts of the accused in such a manner that his status is changed and he becomes a member of the Army without its knowledge or intent that such a result obtains would subject that service to the enrollment of undesirables merely because they were ingenious and their expertise at trickery resulted in obtaining pay and allowances. It is to be emphasized that this is not a case where the Army voluntarily accepted the accused and an enlistment contract—either with or without normal formalities—was executed. This record shows nothing more than a larceny or larcenies by trick in which the Army was undoubtedly duped but not in agreeing to enroll the accused as a member of its community. It was just the victim of a crime committed by a civilian.

**25**

The Supreme Court in United States v Grimley, 137 US 147, 11 S Ct 54, 34 L ed 636 (1890), compared an enlistment contract to one of marriage and, in the course of the opinion, stated that:

"But in this transaction something more is involved than the making of a contract, whose breach exposes to an action for damages. Enlistment is a contract, but it is one of those contracts which changes the status, and where that is changed, no breach of the contract destroys the new status or relieves from the obligations which its existence imposes."

The Court then went on to say:

"By enlistment the citizen becomes a soldier. His relations to the state and the public are changed. He acquires a new status, with correlative rights and duties; and although he may violate his contract obligations, his status as a soldier is unchanged. He cannot of his own volition throw off the garments he has once put on nor can he, the state not objecting, renounce his relations and destroy his status on the plea that, if he had disclosed truthfully the facts, the other party, the state, would not have entered into the new relations with him, or permitted him to change his status."

See also United States v Blanton, 7 USCMA 664, 23 CMR 128.

When that form of contract is being considered, it becomes apparent that both parties must intend to change the status before any act or acts can result in the law saying it has been done. In the case at bar, had there been any understanding between the Government and the accused which contemplated a change in relationship, then his misconduct would preclude him from claiming a reversion to a civilian status. Had there been an agreement to change his legal relationship and he had become a member of the Army, neither his criminal conduct nor his false representation would have insulated him from prosecution. However, we never reach that point, for there was no act on his part which could be construed as offering to enlist in the Army or misleading it into accepting him as a regular member of the service. Before a person can become a serviceman by enlisting, there must be some understanding that the steps taken by the service in processing the applicant will result in a change of status. Here all the Army did was to act in compliance with the purported authority of accused's falsified documents, which served to indicate that his status as a soldier had been accomplished at some prior time. As previously mentioned, the fraudulent acts of this accused caused the Government a loss, but they did not induce the Army to act on the assumption that accused was enlisting, and the facts show that neither party could properly assert that he initiated any process which would legally shed his civilian garb. While the law could impose upon him the legal duty to return his ill-gotten gains, that obligation would rest on the shoulders of any similar wrongdoer, regardless of his status. Certainly, it is most difficult for us to follow the reasoning that thievery changes a civilian to a soldier. A mask of deceit may give rise to both civil and criminal litigation in other courts but, in the military, prosecution can only be initiated legally when the accused is a member of the military service. Membership cannot be established by criminal conduct alone, and a change in status cannot be constructed unless there are legal remedies which should and can be enforced. Such is not the case in this instance. To illustrate the point we ask, which of these parties could be required to fulfill the terms of an enlistment contract? When a contract is constructed, one party, at least, should have a legal civil remedy, and here we find none except the right of the Army to proceed to recoup its losses. That remedy exists regardless of accused's status and, therefore, we are importuned to find a temporary constructive enlistment solely for the purpose of permitting the Army to prosecute the accused criminally. Changing a relationship for that purpose without some prior understanding by the parties seems to us to be stretching a legal

26

fiction beyond the limits of its field. We have no doubt that under certain circumstances an accused may be estopped from asserting that his misconduct released him from his enlistment contract, but an estoppel cannot be used affirmatively to create a contract of entry into the service. Such a holding would result in the unique principle that a civilian could steal his way into the Army, a concept we unhesitantly reject.

Finally, the Government argues that if we cannot sustain jurisdiction under the theory of constructive enlistment, certain of the findings must be supported upon the hypothesis that Article 2(11) of the Code, 10 USC § 802, permits the trial of civilians who accompany the Army overseas. We need not develop that theory for the obvious reason that under our holding the accused is a civilian and, generally speaking, the crimes involved are not chargeable against one in that status. Accused's conviction for forgery was set aside by the board of review, and for the reasons we developed in the principal portion of this opinion, the crime of fraudulent enlistment fails. The crimes of absence without leave, failure to obey the order of a superior officer, and possession of a false pass are all predicated upon the theory spelled out in the specification that the accused was a member of the service which, of course, cannot be sustained. As to the offense of resisting lawful arrest, it is apparent from the issues that all parties assumed a legal apprehension for a military offense because the accused was believed subject to the Code. In light of the theory of the case at the trial level, it is entirely probable that the accused was not subject to arrest for purely military crimes and thus that finding cannot be affirmed.

For the foregoing reasons, the decision of the board of review is reversed and, in view of our holding on jurisdiction, the case dismissed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The record of trial shows more than a mere passing masquerade by the accused. It shows the procurement of an actual "entry into service." See Manual for Courts-Martial, United States, 1951, paragraph 162. Among other things the accused presented an order showing purported enlistment for a period of six years with the estimated time of separation as July 1963. Accordingly, he was placed on the rolls of military organizations as a regular member and assigned military duties. He performed those duties and received pay and allowances therefor. In my opinion, these facts established beyond a doubt that the accused intended to, and did, in fact, effect an entry into the armed service for the ostensible period covered by his false orders. He was, therefore, subject to trial and punishment by court-martial.

As to the other assignments of error, the accused's plea of guilty removed any basis for challenge of the specifications because of ambiguity. See United States v Parker, 3 USCMA 541, 13 CMR 97; United States v Sell, 3 USCMA 202, 11 CMR 202; cf. United States v Fout, 3 USCMA 565, 13 CMR 121. I would affirm the decision of the board of review.