UNITED STATES, Appellee

v

ROBERT G. LARUE, Recruit, U. S. Army, Appellant

11 USCMA 470, 29 CMR 286

No. 13,691

Decided May 13, 1960

First Lieutenant Vernon C. Maulson argued the cause for Appellant,. Accused. With him on the brief was Major Edward Fenig.

First Lieutenant George H. Parsons argued the cause for Appellee, United States. With him on the brief was Lieutenant Colonel James G. McConaughy.

GEORGE W. LATIMER, Judge:

The accused was found guilty by general court-martial of two specifications of fraudulent enlistment, two specifications charging desertion, and two specifications of larceny, each alleging the theft of $980.00, in violation of Articles 83, 85, and 121, Uniform Code of Military Justice, 10 USC §§ 883, 885, and 921, respectively. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for ten years, and the convening authority approved the sentence. A board of review in the office of The Judge Advocate General of the Army set aside the findings of guilty of desertion but affirmed the other findings and so much of the sentence as provides for dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for six years. Thereafter the accused petitioned this Court for a grant of review, and we ordered briefs and arguments on two questions which, stated generally, were these:

1. Did the law officer err in overruling the defense motion to dismiss the charge alleging fraudulent enlistment?

2. Did the law officer err to the prejudice of the accused in admitting certain exhibits?

The facts bearing on the questions will be related as the issues are discussed. As to those relevant to the first question, the record shows that on September 27, 1957, the accused enlisted in the United States Army for six years. Approximately one month later he went absent without leave from his unit at Schofield Barracks, Hawaii. On August 13, 1958, he enlisted in the United States Army under the alias of Robert Grayden Lowery and received a re-enlistment bonus of $980.00. On August 24, 1958, he again went absent without leave and thereafter enlisted a third time under the alias of Richard Craig Gogelman and received a second re-enlistment bonus of $980.00. On September 11, 1958, he absented himself without leave and remained in that status until he surrendered to military authorities on October 2, 1958, under the name of Robert G. LaRue. He was tried by a general court-martial for his original absence from Schofield Barracks, Hawaii, found guilty and sentenced to six months confinement and partial forfeitures for a like period. While serving this confinement, the other recited misdeeds came to light, and he was charged with them and brought to trial in the instant case.

At the time of trial, defense counsel made a motion to dismiss each specification of fraudulent enlistment on the ground that it failed to allege any offense. The basis of the motion was that the pleading showed affirmatively that at the time the accused was alleged to have fraudulently enlisted he was a member of the United States Army and that fraudulent enlistment requires a change from a civilian to a military status. The law officer denied the motion, and it is this ruling which is the subject of the first granted issue.

Article 83 of the Uniform Code of Military Justice, supra, which defines the offense, insofar as relevant to this issue provides for the punishment of:

"Any person who—
(1) procures his own enlistment or appointment in the armed forces by knowingly false representation or deliberate concealment as to his qualifications for that enlistment or appointment and receives pay or allowances thereunder; . . ."

The above-quoted Article is precise, clear, and unambiguous, and when the words are given their ordinary meaning and import they express a Congressional intent to encompass within the proscription of the statute all persons, civilian or military, fraudulently inducing their enlistment in one of the armed forces. The first phrase of the Article is all-inclusive, for it uses the words "any person," and, therefore, unless there is some other Federal statute or a well-recognized custom of the service covering the same subject matter which would render the meaning of the words

**471**

uncertain or ambiguous, there is no reason for us to resort to interpretation.

In United States v Jenkins, 7 USCMA 261, 22 CMR 51, we were confronted with the construction of this same statute. While we were there concerned with the meaning of a different portion of the Article, like the phrase presently under consideration, it was not, in and by itself, ambiguous. In that instance we restated the following well-established canon of statutory construction:

"A statute must necessarily be interpreted in accordance with the announced intention of the legislature. If the words used in the statute are precise and convey a definite understanding a court should not cast about for a different meaning. United States v Dickenson, 6 USCMA 438, 20 CMR 154; United States v Cooper Corporation, 312 US 600, 61 S Ct 742, 85 L ed 1071; Hassett v Welch, 303 US 303, 58 S Ct 559, 82 L ed 858. In 50 Am Jur, Statutes, § 225, page 207, a generally accepted rule is pronounced: 'A plain and unambiguous statute is to be applied, and not interpreted, since such a statute speaks for itself, and any attempt to make it clearer is a vain labor and tends only to obscurity.' "

Appellate defense counsel seek to avoid the holding of that case by asserting that ambiguity becomes apparent when the historical development of the statutes prescribing desertion and fraudulent enlistment is considered, for it shows that the term "all persons" should be narrowed to exclude those individuals who are members of the military service. And additionally it is contended that Article 85(a)(3) of the present Code indicates a Congressional intent to have the crime of desertion cover this offense when committed by a serviceman. We are willing to consider the hypotheses but we reject the validity of both arguments. Our reasons for so doing will appear as we discuss each assertion.

Fraudulent enlistment as a specific criminal offense was not defined in the early Articles of War. But by the Act of July 27, 1892, which amended the

**472**

Military Code of 1874, it was made punishable under Article of War 62—the General Article—when pay and allowances were received, 27 Stat 278. In 1916, the Sixty-Fourth Congress passed the first punitive Article defining the crime. Article of War 54 provided as follows:

"Any person who shall procure himself to be enlisted in the military service of the United States by means of willful misrepresentation or concealment as to his qualifications for enlistment, and shall receive pay or allowances under such enlistment, shall be punished as a court-martial may direct." [39 Stat 659.]

At that same time Article of War 29 was enacted. It provided:

"Any soldier who, without having first received a regular discharge, again enlists in the Army, or in the militia when in the service of the United States, or in the Navy or Marine Corps of the United States, or in any foreign army, shall be deemed to have deserted the service of the United States; and, where the enlistment is in one of the forces of the United States mentioned above, to have fraudulently enlisted therein." [39 Stat 655.]

It is to be remembered that desertion was proscribed by Article of War 58 of that year, 39 Stat 660, so it should be apparent from the wording of Article 29 that while desertion results from any enlistment without prior discharge, when the enlistment by a soldier is in one of the forces of the United States his entry into service is fraudulent and also subject to being punished. Nothing is said in that Article about pay and allowances, but that element is mentioned in Article 54, the punitive Article which specifically defines the offense, and in addition, one already in the service might possibly be guilty of an offense even though he received no pay. Be that as it may, however, from the contents of Article 29 it appears with certainty that Congress intended to include servicemen within the classes of persons who could fraudulently enlist.

It is interesting to note that prior

to the Act of July 27, 1892, there was respectable authority to the effect that civilians who fraudulently enlisted could not be tried by a court-martial because the misrepresentations were made prior to the time the person was subject to military law. Of course, under that theory only servicemen would be subject to be tried for the offense by military courts and to escape unconstitutionality, the words "any person" would have to be construed to apply only to members of the armed services. However, the view changed when Congress made the receipt of pay and allowances an element of the offense. Colonel Winthrop in his Military Law and Precedents, 2d ed, 1920 Reprint, page 733, discusses the question and makes this comment:

"FRAUDULENT ENLISTMENT. By the recent enactment of July 27, 1892 ch. 272, sec. 3, it was provided —'That fraudulent enlistment, and the receipt of any pay or allowance thereunder, is hereby declared a military offence, and made punishable by court-martial under the 62d Article of War.'

"Nature of the offence. Prior to this legislation, fraudulent enlistment was not, in the opinion of the author, triable by court-martial, for the reason that the fraudulent representations, &c., in which the offence consisted must have been preliminary and made as an inducement to the enlistment, and so before it was consummated, and while therefore the individual was still a *civilian* and not constitutionally amenable to such trial. A statute assuming to make mere fraudulent enlistment so triable would not remove the objection, since a statute cannot do away with a constitutional incapacity or confer jurisdiction where the constitution denies it. But the receipt of 'pay' or an 'allowance' under an enlistment knowingly fraudulent *is* an offence, because the pay, &c., is not received till the enlistment has been completed and the party is actually in the military service."

The 1916 statute on enlistment without discharge quoted previously, which includes the provision on fraudulent enlistment, was re-enacted in substantially the same language in 1920 and left unchanged in 1948. The provision was restated that where the enlistment of a soldier was in one of the forces of the United States, it was fraudulent. The portion dealing with desertion shows a substantial difference between that offense and fraudulent enlistment, for desertion results from enlistment in a foreign service, while fraudulent enlistment does not. Moreover, desertion by re-enlistment had its genesis in Congressional enactment long prior to 1916, for more than a century earlier the Articles of War of 1806 provided that if a noncommissioned officer or soldier enlisted in another regiment, troop or company without a regular discharge, he was deemed guilty of desertion, but nothing was said about fraudulent enlistment. Article of War 22, 2 Stat 362. See also Article 3 of Section VI of the Articles of War of 1776. It would thus appear that fraudulent enlistment was a later creature of statute and that it was intended to be separate and distinct from desertion. One further straw in the wind which supports our view is the early construction of fraudulent enlistment as proscribed by the General Article under the 1892 enactment. In giving instances of various ways of committing that offense. Colonel Winthrop in his Military Law and Precedents mentions, at page 734: "Concealment by the party of the fact that he was a deserter." This illustration appears to us to be on all fours with the case at bar. We find, therefore, through the years up to and including 1950, a Congressional intent not to narrow the plain meaning of the words "any person," which were used in defining the crime, by excepting servicemen from criminal responsibility for fraudulent enlistment.

That brings us up to the Uniform Code of Military Justice. It is to be noted that Article 85(a)(3), supra, which deals with re-enlistment desertion, does not make mention of fraudulent enlistment. It is argued that from this deletion it necessarily follows that Congress intended to change the law as it had previously existed and eliminate members of the service from

the classes which could commit the crime of fraudulent enlistment. That conclusion does not follow necessarily. Prior to that time, as we have indicated, the relevant two specific punitive Articles were overlapped to a certain extent in Article of War 29 of 1916 and continued so through Article of War 28 of the Elston Act. Hence, when the Uniform Code was enacted, it was entirely proper for Congress to separate the two offenses, clear up any doubt about the intermingling of crimes, and have desertion, including the re-enlistment variety, covered entirely within one Article. That was an orderly correction which could be made by eliminating any reference to fraudulent enlistment in Article 85 and by leaving the wording of Article 83 untouched by mention of desertion. The latter Article does not exclude individuals who are members of a service, and the former was stripped merely of unnecessary verbiage. As now written, when the two statutes are interpreted together, they are consistent, and each serves a necessary purpose. Accordingly, for us to eliminate servicemen from the coverage of Article 83 when they are included within the fair meaning of its language would require a positive showing of Congressional intent to that effect. We are unable to find such intent expressed or implied in the various statutory enactments.

The next argument pressed on us by appellate defense counsel is that when Congress enacted Article 85 of the Uniform Code of Military Justice and made fraudulent enlistment evidence of desertion, it pre-empted the field and the rule announced in United States v Norris, 2 USCMA 236, 8 CMR 36, requires reversal. In that instance, we held the Government could not prosecute an accused under Article 134 when Congress had defined the crime in a separate Article. Here the prosecution was not under the General Article; there is a specific Article which defines the offense; it contains elements not necessarily involved in desertion; and, as we have shown, the Congressional enactments show an intent on the part of Congress not to pre-empt the field.

**474**

One other facet of the controversy should be mentioned. Accused relies on United States v King, 11 USCMA 19, 28 CMR 243, as authority for the proposition that we must dismiss the two specifications. The argument proceeds on the theory that there must be a change in status and, because the specifications show the absence of that element, an offense is not alleged. In making that argument, appellate defense counsel overlook the rationale of that case. There we were not dealing with the elements of an offense or with pleadings but rather with a question of jurisdiction. At the time of the commission of the offense, King was a civilian and not subject to trial by court-martial, but in the case at bar the accused was subject to the Code at the times he fraudulently enlisted. The reason status was important there was because military courts cannot try civilians, which is in no sense involved in this litigation. We, therefore, decide this issue contrary to the assertions of accused.

The second issue requires that we reverse the findings and sentence. Over the objections of defense counsel, the law officer admitted two letters from The Adjutant General of the Army setting forth certain information probably necessary for administrative purposes. However, much of the information contained in the letters was incompetent in a criminal trial and, assuming without deciding that parts of the documents were admissible, that which was inadmissible should have been masked. It appears to us that this case is on a par with United States v Schaible, 11 USCMA 107, 28 CMR 331, and, accordingly, we repeat a view therein expressed:

"Government counsel seek to support the ruling by advancing the argument that the official document as a whole was admissible because Air Force regulations require the recording of all the information shown in the entries. True it is that we have held an official record is admissible in evidence when it is made in accordance wth regulations by an officer charged with the duty of preparing the same. United States v

Parlier, 1 USCMA 433, 4 CMR 25. However, we have also held that merely because a document is official does not render everything recorded therein admissible. United States v Hall, 10 USCMA 136, 27 CMR 210. Materiality, competency, and relevancy are essential before testimony should be placed before members of the court. In this particular instance we are confronted with an official record which contained information showing prior acts of misconduct. At best, they were unnecessary and largely irrelevant to any issues before the triers of fact and they were of a type which tended to besmirch the character of the accused and brand him as a person with a penchant for committing crimes. When that situation arises, a law officer should give consideration to the policy considerations which raise a bar to the use of the testimony even though it might be otherwise admissible. Had this law officer stopped to consider the damage to the accused as compared to the need of the Government to use the testimony, he would have necessarily reached a conclusion that it should not have been admitted into evidence before the court members."

To put the letters in their true perspective, we restate the propositions that the accused was being tried for two fraudulent enlistments and larcenies of the money received as re-enlistment bonuses. Conviction on the theft crimes depended in part on the fraud in enlisting, and so they largely stand or fall together. Some of the comments in the letter are conclusions on the part of The Adjutant General of the Army, and they go right to the heart of these crimes. For illustrative purposes, we quote some of the statements: "It appears that at time of enlistment on 13 August 1958, this individual presented an altered or fictitious DD Form 214"; "Inasmuch as this man, at time of enlistment on 13 August 1958, concealed his unterminated enlistment of 24 September 1957, his current enlistment is fraudulent within the purview of section I, AR 635–206"; "Action will be taken to drop this man from his fraudulent enlistment of 13 August 1958 in accordance with the provisions of paragraph 6e (2) and (4), AR 635–206"; "It appears that this man at time of enlistment on 5 September 1958, presented a falsified DD Form 214, bearing name and service number as Richard C. Gogelman, RA 52 425 501." In addition to the quoted comments, there was set out in the letters conclusions that certain different sets of fingerprints were identical and were those of Robert G. LaRue.

Without expressing an opinion on the admissibility of the fingerprint comparison, which is nonprejudicial because there is a proper certificate and the evidence is cumulative, we are at a loss to understand the reason for admitting the balance of the information. Other testimony in the record established the essential facts to support a conviction and, while trial counsel stated he was offering the letters to prove they were the first notice to the unit commander of the accused's dual status, that purpose, if material, does not justify admitting the documents in their entirety. Appellate Government counsel assert the letters have some relevancy in establishing the dates the desertions terminated, but it is conceded this information was adequately established by other exhibits. Certainly, so far as this record is concerned, there was absolutely no necessity for using exhibits containing much hearsay evidence which was clearly incompetent.

That brings us to the question of prejudice. It is difficult to escape the conclusion that documents bearing the command line of the Secretary of the Army and carrying the signature of the highest administrative officer of that service would not be impressive when placed before the court. They were admitted by the law officer without restrictive instructions as to their consideration, and they contained conclusions which invaded the fact-finding province of the court-martial. Reasonably construed, they would impress the court members with the fact that the Department of the Army had determined the issue of guilt on the fraudulent enlistment charges. Once that is determined, the same impact would bear on all the

offenses charged. It is true that the evidence of guilt is strong, but it is circumstantial and we are satisfied there is a fair risk that the documents unfairly bolstered the cause of the Government. Accordingly, we find prejudice.

The decision of the board of review is reversed. A rehearing may be ordered.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

While I agree with Judge Latimer that this cause must be reversed because of the prejudicial receipt of hearsay evidence, I have some reservations concerning the argument that the fingerprint evidence was merely cumulative. There is in my mind a substantial question whether an expert comparison of fingerprints can, except by stipulation of the parties, be competently established by introduction of a "Certificate" executed by The Adjutant General. Cf. United States v White, 3 USCMA 666, 14 CMR 84. Compare United States v Jacoby, 11 USCMA 428, 29 CMR 244, and Hearings before the House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 1016, et seq. Nevertheless, that issue is not now before us, and its resolution must await the occasion on which it is properly presented, briefed, and argued.

I am wholly unable to agree with my brothers' conclusions that this accused was correctly found guilty of fraudulent enlistment, in violation of Uniform Code of Military Justice, Article 83, 10 USC § 883, for it is inconceivable to me that Congress sought to punish the "re-enlistment" of one who already possesses the status of an enlisted man in the same armed force. For the reasons hereinafter set forth, I believe it clear that the legislative purpose behind Code, supra, Article 83, was to protect the armed forces against the fraudulent entry of undesirable civilians and that the services are adequately guarded against incidents similar to those depicted in this record by Code, supra, Articles 85 and 121, 10 USC §§ 885, 921,

violation of both of which, incidentally, also was charged here.

The factual background for the offenses involved is relatively simple. Accused absented himself without leave from his station in Hawaii, where he was serving a six-year enlistment into which he entered on September 27, 1957. On August 13, 1958, he "enlisted" again in the Army under the name "Lowery" and, because of his false representations, received a re-enlistment bonus of $980.00. On August 24, 1958, as "Lowery," he absented himself without leave. Subsequently, he again enlisted in the Army as "Richard Craig Gogelman" and received a second re-enlistment bonus of $980.00. On September 11, 1958, he departed from his new station without authority. On October 2, 1958, he surrendered to military authorities under his true name, as an absentee from his original, *bona fide* enlistment. Tried for desertion, he was convicted of absence without leave and sentenced to confinement at hard labor for six months and forfeitures. During his service of this sentence, local military authorities were made aware of his various "enlistments," receipt of bonuses, and "absences without leave." Charges of desertion from each such enlistment, fraudulent enlistment, and larceny by false pretenses, were immediately preferred. Following his trial, which resulted in findings of guilty and a sentence to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for ten years, the board of review dismissed the desertion charges. We granted review on the issues whether accused's conduct constituted fraudulent enlistment within the purview of the Code and whether receipt of hearsay evidence prejudiced his substantial rights. As heretofore noted, my principal disagreement is with the majority's resolution of the former issue.

Code, supra, Article 83, provides pertinently:

"Any person who—
(1) procures his own *enlistment* or appointment in the armed forces by knowingly false representation or deliberate concealment as to his quali-

476

fications for that enlistment or appointment and receives pay or allowances thereunder; . . .

. . .

shall be punished as a court-martial may direct."
[Emphasis supplied.]

In United States v Jenkins, 7 USCMA 261, 22 CMR 51, a unanimous Court pointed out that the term "enlistment" used in the foregoing statute means "active enrollment in the service." United States v Jenkins, supra, at page 264. In the same case, we also recognized the accuracy of Colonel Winthrop's declaration that enlistment is "a voluntary contract for military service for a certain term *entered into by a civil person* with the United States." (Emphasis supplied.) Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 538. And in United States v King, 11 USCMA 19, 28 CMR 243, we stated that an enlistment in the armed forces is one of that peculiar group of contracts which effects a change of an individual's status. See also United States v Blanton, 7 USCMA 664, 23 CMR 128.

The same concept has been espoused by the United States Supreme Court. In United States v Grimley, 137 US 147, 11 S Ct 54, 34 L ed 636 (1890), the Court drew an apt analogy between entry into the armed services and the contract of marriage. Speaking on the nature of the former, Mr. Justice Brewer said, at pages 151–152:

". . . Enlistment is a contract; but it is one of those contracts which changes the *status;* and where that is changed, no breach of the contract destroys the new *status* or relieves from the obligations which its existence imposes. Marriage is a contract; but it is one which creates a *status.* Its contract obligations are mutual faithfulness; but a breach of those obligations does not destroy the *status* or change the relation of the the parties to each other. The parties remain husband and wife, no matter what their conduct to each other—no matter how great their disregard of marital obligations." [Emphasis supplied.]

Here, there is no doubt that the ac-

cused's original enlistment removed him from civilian life and made him a member of the United States Army. Having validly achieved that *status,* how could he again obtain it by twice purporting to renew his obligation? Once more, the analogy between a contract of marriage and one of enlistment is pertinent. One who undertakes the solemn obligation of wedded bliss enters upon a new *status.* Having accomplished the marriage and as long as he possesses a living, undivorced spouse, his efforts to enter into new marriages are absolutely void. By reason of his *status* as a married person, he is totally disabled from again acquiring the position which he already occupies. In like manner, a valid enlistment creates the status of soldier. Having acquired that position, it seems clear that the individual concerned cannot repeatedly obtain that which he already possesses simply by pretending to re-enter the armed forces. United States v King, supra. In short, one who is already a member of the armed forces cannot create a new contract of enlistment. As Code, supra, Article 83, requires an entry into the service *by enlistment,* it necessarily follows that a member of the armed forces cannot commit the offense of fraudulent enlistment by committing a void act.

In light of the foregoing, I do not find my brothers' historical analysis of Code, supra, Article 83, persuasive. Initially, I note that it overlooks Colonel Winthrop's express limitation of the term "enlistment" to entries into the service from civil life. Winthrop, supra, page 538. More specifically, it omits that commentator's opinion that re-enlistment without the required discharge was not fraudulent enlistment:

"Fraudulent enlistment has sometimes been charged as consisting in an enlisting 'without a regular discharge' from a previous enlistment, the offence expressly made punishable by Art. 50. *But this offence, as has heretofore been pointed out, is a* form of *desertion,* and is erroneously charged as 'fraudulent enlistment,' or otherwise than as 'desertion.' " [Emphasis partially supplied.] [Winthrop, supra, page 735.]

**477**

If, as Judge Latimer suggests, the offense denounced by Code, supra, Article 83, descends in an unbroken line of Congressional enactments from the Act of July 27, 1892, 27 Stat 278, effective in Winthrop's day, and that our statute should be construed in light of its predecessors, it would appear that we should give due weight to their construction by that author. His view surely accords with the denomination of an enlistment as involving a change of status, and our heretofore expressed view that it connotated an entry into the service from civil life. United States v Jenkins, supra.

Finally, I point out that the construction of Code, supra, Article 83, for which I contend, in nowise deprives the services of protection against those evildoers who seek repeatedly to "enlist" during a period of unauthorized absence. Code, supra, Article 85, expressly establishes that such re-enlistments are evidence of desertion. United States v Huff, 7 USCMA 247, 22 CMR 37; United States v Johnson, 5 USCMA 297, 17 CMR 297. Winthrop, supra, page 735. Code, supra, Article 121, provides equally for the punishment of larceny by false pretenses. Indeed, those offenses were charged here. Under the circumstancs, it is difficult to see the necessity for the liberal interpretation accorded the penal statute which we today consider. I suggest that the better view, and the one compelled by the authorities, is limitation of fraudulent enlistment to those civilians who fraudulently obtain entry into the service by enlistment and thereafter receive pay and allowances. United States v Jenkins, supra.

Agreeing that a rehearing must be ordered herein, I would also direct dismissal of the charges of fraudulent enlistment.