UNITED STATES, Appellee

v

MARVIN C. HODGES, Technical Sergeant,
U. S. Air Force, Appellant

14 USCMA 23, 33 CMR 235

No. 16,220

May 10, 1963

*Vincent P. McCauley, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Robert J. Childers, Esquire, Colonel Joseph E. Krysakowski,* and *Major Charles K. Rush.*

*Captain Donald W. Brewer* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

### Opinion of the Court

QUINN, Chief Judge:

A telephone call from California to the accused in Germany, about July 1959, started a chain of events which led to his conviction by general court-martial in 1961, at Malmstrom Air Force Base, Montana, of a charge of carnal knowledge of his fifteen-year-old daughter; incest and pandering, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. The convening authority set aside and dismissed the pandering charge, but otherwise affirmed the findings of guilty and the sentence, which includes a dishonorable discharge and confinement at hard labor for three years. A board of review affirmed. The accused appealed to this Court.

Seventeen assignments of error were set out in the accused's petition for

review. We granted review to consider two of these assignments. The first issue deals with the overruling of defense objections to the right of the law officer to sit in the case. The initial challenge was made at the beginning of trial, after a *voir dire* conducted by both individual defense counsel and the appointed defense counsel. The challenge was predicated on the ground the law officer was disqualified, because, before trial, he had read "the testimony of the only two witnesses in the 32," Zona Hodges, the accused's daughter, and Airman Charles W. Cook; and he had "necessarily formed a prior opinion" as to the accused's guilt or innocence. The challenge was renewed on the second day of the four-day trial, and the alleged effect of the law officer's prior recourse to the Article 32 record was expanded to include the charge that certain of his rulings in open court were "impossible unless . . . [he] had a pre-conceived opinion or bias on the testimony of" the accused's daughter. On both occasions the challenge was not sustained.

Acting on his own "volition," the law officer obtained the file of the Article 32 proceedings. He read all the testimony given by Zona and part of the testimony of Airman Cook. He did not, however, read "the entire 32." His purpose in examining the file was "to determine whether there were questions which would most likely arise which would permit . . . research." Before trial, he directly informed defense counsel of the "particular areas" with which he was concerned. He had no "pre-conceived opinions" as to the guilt or innocence of the accused, and no "preconceived opinion of the truth of any statement" in the Article 32 proceedings. He was absolutely prepared to rule "fairly and impartially" on matters presented to him. As to the rulings made before the second challenge, "None" were "guided" by his previous reading of parts of the Article 32 record; all were based upon his "sincere belief of the law."

Total ignorance of the prospective evidence in the case is not a *sine qua non* for qualification of the law officer or a court member. United States v Talbott, 12 USCMA 446, 31 CMR 32; see also United States v Richmond, 11 USCMA 142, 28 CMR 366. Prior knowledge is disqualifying only if it "produces a conviction of guilt." United States v Fry, 7 USCMA 682, 685, 23 CMR 146; cf. United States v Renton, 8 USCMA 697, 25 CMR 201. In the *Fry* case, we said it was not good practice for the law officer to review the investigating officer's report and the testimony of witnesses, because a "thorough knowledge" of the expected testimony might result "in at least the *formation* of a definite opinion of guilt" and subject him to challenge for cause. We pointed out that information as to the possible issues "can normally be obtained" by reading the charges, and by asking counsel to inform him of the legal matters that may arise at trial.

A failure to follow good practice is not *per se* reversible error; it must further appear that the procedure actually followed presents a fair risk of prejudice to the accused. United States v Fry, supra; see also United States v Lindsay, 12 USCMA 235, 30 CMR 235. Consequently, we must reject accused's urging to strike down his conviction merely because the law officer looked into the record of the Article 32 investigation. Here, as in *Fry*, at page 686, we "scrutinized the record of trial for evidence that . . . [the law officer's] previous knowledge had a harmful effect" upon the rights of the accused. We found none. And the accused's specific attack on the propriety and legality of the law officer's conduct and rulings is not supported by the record of trial.

One clear indication of prejudice, says the accused, is that the law officer "continually interrupted questioning by the individual or appointed defense counsel." The first interruption by the law officer came during the inquiry into Zona's competency to testify. Zona admitted she did not "pro-

fess any religious belief," but she could "give an oath to a God who is the Controller of everything." Individual defense counsel inquired whether Zona's God was the same God "Christians recognize or that Jews recognize." Trial counsel objected on the ground that the belief in God goes beyond Christian or Jewish belief. The objection was sustained. Nevertheless, defense counsel continued to ask the same questions. The law officer said: "I believe I sustained that objection before, and I will ask a few questions of the witness myself." Defense counsel objected to the law officer "acting as counsel in this case." We discern no impropriety or bias in this interruption. The competency of a witness is a matter for the law officer's determination. United States v Slozes, 1 USCMA 47, 1 CMR 47. The defense examination of Zona had progressed sufficiently to provide a clear picture of the basis of the objection to her competency. Further elaboration was not required. We conclude there was no abuse of discretion or prejudice against the accused in the law officer's action.

The second interruption took place during the cross-examination of Zona by individual defense counsel. The law officer indicated that counsel had asked "this question repeatedly" and it appeared to him counsel was "badgering the witness on this point." Perhaps the obligation to protect the witness against overly aggressive or repetitive examination by opposing counsel rests, in the first instance, with the attorney calling the witness, but the law officer is not a mere figurehead in the trial proceedings. He is the judicial officer, and is, to some extent at least, responsible for the trial conduct of counsel for both parties.

See United States v Scoles, 14 USCMA 14, 33 CMR 226. He, no less than counsel, may protect the witness against harassment of one kind or another. The question that prompted the law officer's comment had, in fact, been asked and answered in several forms. There was nothing improper in the law officer's action in this respect.

The third interruption was a comment calling on counsel to stop an exchange between themselves. The law officer remarked that the "reporter can only take one person at a time." The interruption and the comment were entirely appropriate.[1] The fourth interruption and the comment, which culminated in the renewal of the defense challenge of the law officer for cause, also occurred during Zona's cross-examination. She had been under examination for almost an hour and a half when trial counsel called for a "short recess" because the witness "is under quite a strain." The law officer denied the request and the cross-examination continued as follows:

"IDC: Now in connection with your trip to Gore Hill, you testified yesterday that you suggested to your father and to Bill Cook that you go to Gore Hill, is this right?

"A: Yes, sir.

"Q: Now, do you recall what you said about this subject at the Article 32 investigation?

"A: I don't remember exactly everything I said. I couldn't repeat it to you verbatim. I'm sorry.

"Q: Anything you said at the Article 32 investigation?

"A: I suppose I said the same thing. I will save you asking about it now.

"Q: You say you didn't say anything inconsistent with this?

---

[1] The personal differences between trial counsel and the accused's lawyers, which several times led the law officer to caution all counsel about their conduct, is well illustrated by the following excerpt from the record:

"Q [IDC]: In the Article 32, did you not testify that, among other things, you said in the custody hearing your mother was promiscuous?

"TC: Would you tell me what page you are on?

"IDC: No, you haven't shown me any courtesy, why should I show you any? Would you answer the question? This was an uncalled-for interruption.

"A: Would you repeat it, please?"

"LO: There will be a fifteen minute recess. I would like a hearing with the counsel during that recess. If it is acceptable with the court, we will proceed at, say, five minutes after eleven. The court will be recessed."

At the out-of-court hearing, the law officer pointed out, as he had earlier, in regard to two letters written by Zona which the defense attempted to use, what he considered to be the correct procedure for impeaching a witness by a prior inconsistent statement. The discussion continued for forty minutes with both individual defense counsel and appointed defense counsel arguing the question of the admissibility of the letters. The law officer concluded the hearing with the following statement:

"LO: This out-of-court hearing is being held out of the presence of the court and out of the hearing of the spectators. I am trying, gentlemen, speaking to the defense, not to impose any limitations upon cross-examination. I did ask several times the purpose of this, and, of course, the assigned defense counsel has indicated that it was in the area of competency, and certainly I don't want to any way preclude the defense from asking any proper questions, but it is my thought that proper examination, in reference to Article 32s would be to ask the witness for testimony regarding a particular point, and then, and only then if it appears that the Article 32 testimony is necessary for the purpose of prior inconsistent statements. We could refer to the Article 32 possibly to the basis for referring to it, but at the time it primarily would appear to be a matter of possibly prior inconsistent statements. Now, do I make my question clear, and the problem with which I am confronted clear?"

In our opinion, there was no impropriety in the law officer's action, nor is there any suggestion of a purpose or desire, as contended by the accused, to give trial counsel time to "confer with" and "prepare" Zona to meet possible impeachment.

Similarly, we find no bias or prejudice against the accused in the law officer's rulings. Most of them were favorable to the accused. Of course the number of favorable rulings does not, standing alone, establish a lack of prejudice or bias; one unfavorable ruling on a crucial point may be extremely disadvantageous to the accused. See United States v Brown, 10 USCMA 482, 28 CMR 48; United States v Cates, 9 USCMA 480, 26 CMR 260. However, it is, at least, a general indication of the law officer's attitude toward the accused. Looking specifically and closely at the adverse rulings, there is just no room to doubt the truth of the law officer's statement, during the challenge proceedings, that he had no such preconceived idea of the accused's guilt or innocence as would affect his impartiality and fairness. Most of the objections that were overruled were on the ground the question was leading. The accused does not complain about any of these. He does maintain, however, that the rulings on the procedure the law officer ordered defense counsel to follow in laying the foundation for the use of the two letters written by Zona, are explainable only as an "effort to protect the witness, [and] prevent the Defense from practically destroying her testimony in chief." The letters, as noted above, were alleged to be inconsistent with Zona's direct testimony. The matter arose as follows:

"Q [IDC]: Now, did you ever write a Miss Ellen Hodges in August 1959, telling her that you had had intercourse with the sailor?

"A: I don't remember if I wrote and told her or not.

"Q: I request this be marked Defense Exhibit A for identification purposes. I show you what will be marked Defense Exhibit A for identification purposes, a letter, and will you look at this and tell the court whether that is your writing?

"A: Yes.

"Q: Did you write and mail that letter?

"A: I beg your pardon.

**27**

"Q: Did you write and mail that letter?

"A: Yes.

"Q: Can I have Defense Exhibit A for identification purposes. I will request that this document be marked Defense Exhibit B for identification purposes. What has been marked Defense Exhibit B for identification—will you look at this letter and tell me whether or not you wrote that letter—your handwriting. Do you recognize that writing as your writing?

"A: Yes.

.   .   .   .   .   .

"Q: Now I will read this part of it—

"TC: I will object to that.

"LO: Objection is sustained.

"IDC: I want to ask this witness if she wrote and this was a verbal statement she made in 1959.

"LO: I believe counsel originally asked the question whether or not the witness had made specific statements in a letter. The witness said, 'I do not recall.' I believe the proper course would be to ask the witness if this is the letter to which you referred. I believe the proper question would be to ask the witness to answer the question, having seen the letter.

.   .   .   .   .   .

"LO: . . . She indicated, as I recall the testimony, that she didn't remember. If that is the case, and your purpose is to refresh her memory, I would suggest you follow the proper course."

The general rule regarding impeachment of a witness by an inconsistent statement is set out in the Manual for Courts-Martial as follows:

"A witness may be impeached by showing by any competent evidence that he made a statement (or engaged in other conduct) inconsistent with his testimony, but a foundation must first be laid before introducing evidence of an inconsistent statement. The foundation for the introduction of evidence of the making of an inconsistent oral statement is laid by asking the witness if he made the inconsistent statement, at the same time directing his attention to the time and place of the statement and the person or persons to whom it was made. This procedure may also be used in the case of an inconsistent written statement, and, if it is used, the writing need not be shown to the witness. If the witness admits making the inconsistent statement, no other proof that he made it is admissible. If he denies making the statement, or testifies that he does not remember whether he made it or not, or refuses to testify as to whether he made it, evidence that he did make the statement may be introduced. When the inconsistent statement is contained in a writing apparently signed or written by the witness, a sufficient foundation may be laid by showing the writing to the witness and asking him whether the signature is his or whether he was the author of the written statement. If he admits that the signature is his or that he was the author, the writing then becomes admissible in evidence. If he does not make any such admission but either of these facts is otherwise proved, the writing will then become admissible in evidence." [Manual for Courts-Martial, United States, 1951, paragraph 153b(2)(c).]

As the Manual points out, a writing containing an impeaching statement need not be shown to the witness. Apparently the law officer confused the rule of refreshing the recollection of a witness by a writing, which requires that the witness be shown the writing, with the rule on impeachment. The fact that a ruling, even an important one, is wrong does not mean it is the product of a biased attitude. United States v Bishop, 11 USCMA 117, 28 CMR 341; see also United States v Lindsay, supra.[2] We have scrutinized

---

[2] Where there is no evidence of bias as the motivating basis for a particular ruling, the ruling must be judged solely by its prejudicial effect upon

28

the record of trial, and find no evidence to support the challenge of the law officer on the ground he was biased against the accused, or that he entertained a preconceived conviction of the accused's guilt which colored his conduct and rulings at trial.

Turning to the second claim of error, the question is whether the accused was prejudiced by the law officer's ruling allowing Doctor Winfield Scott Wilder to testify to his opinion of Zona's truthfulness. To a great extent, the defense was based upon an attack on Zona's credibility. A number of witnesses who had personal association with Zona testified on behalf of the accused. The accused's brother said he would not believe Zona "under oath"; the accused's brother-in-law, an attorney, said that in his opinion Zona "had a mental and emotional problem and . . . had no real conception as to the distinction between truth and falsehood." Zona's mother said Zona would "stress [stretch?] the truth, particularly to obtain some objective, and . . . would be proned [sic] to make statements for which there is no factual basis"; she believed Zona should have psychiatric "evaluation." A neighbor for eight years stated she had "reasonable doubts about . . . [Zona's] capabilities of telling the truth in a serious matter." The accused's niece testified she believed Zona had "misplaced . . . values" and she would lie if "it would be justified by the ends"; she would not believe Zona "under oath." The accused's present wife testified to circumstances suggesting that Zona might lie because of her difficulties with the accused; she said Zona had lied to her and she would not believe her under oath. In addition, on cross-examination of Zona, the defense elicited testimony to the effect that Zona had several times attempted suicide and that she had consulted a psychiatrist.

In rebuttal, the Government called

Dr. Wilder. He testified he was a psychiatrist in Great Falls, Montana. Zona was his patient for about three months, during which time he saw her about once a week. He described Zona as a schizoid personality. In his opinion she suffered from a character disorder which caused her to "have difficulties in . . . getting along . . . with other people." Dr. Wilder further testified, over defense objection, that in the course of his treatment of Zona he had learned of "her background." With this "background in mind," the details of which were not disclosed, the doctor had "no feeling at any time that . . . [Zona] was not telling . . . the truth." On cross-examination, the doctor stated that Zona could lie if "motivated." Under further inquiry by the law officer, he said that in his treatment of Zona he had to decide whether to classify her as a schizoid personality or as a sociopathic personality. The "primary difference" between the two, said the doctor, is the desire and the capacity to tell the truth. To the sociopathic, "truth and lying would make no difference . . . except as it served his own immediate ends"; in the case of the schizoid, there is "a greater than average amount of possibility for not telling the truth," but still there is a desire and an effort to tell the truth.

The accused contends that Dr. Wilder's testimony was inadmissible and prejudicial because he purported to testify as an expert on Zona's veracity. He insists that Dr. Wilder was called as a medical expert, not as an expert on character. We do not interpret Dr. Wilder's testimony in that light. The fact he is a member of the medical profession did not preclude him from testifying to his opinion of Zona's veracity, as that opinion was based upon his association with her. In this regard his testimony is no different from that of the accused's brother-in-

a substantial right of the accused. Here, the allegedly inconsistent statements in the letters were fully inquired into at trial. There was, therefore, no prejudice resulting from the

law officer's comments on the proper procedure. For that reason we denied the accused's assignment of error in regard to the law officer's refusal to admit the letters into evidence.

**29**

law who, as a member of the legal profession, was not disqualified from testifying to his opinion of Zona's lack of truthfulness. Cf. United States v McClure, 11 USCMA 552, 29 CMR 368. Previous to the doctor's statement of his opinion of Zona's veracity, the law officer sustained a defense objection to that testimony "until . . . the extent of the [doctor's] association [with Zona] has been shown, and then . . . [he would determine] whether such evidence is admissible." He admitted the testimony only after the association with Zona was established. His ruling was correct.

As to Dr. Wilder's testimony of Zona's psychiatric classification and the capacity of a person ▆▆▆▆▆ ▆ so classified to tell the truth, we need say only that it is unnecessary here to inquire into the permissible limits, if any, of such expert testimony. Cf. United States v Hiss, 88 F Supp 559 (SD NY) (1950); Taborsky v State, 142 Conn 619, 116 A2d 433, 437–438 (1955); Wigmore, Evidence, 3d ed, §§ 931, 934 a; see also Conrad, "Psychiatric Lie Detection," 21 FRD 199, 203. Suffice it to point out that the defense opened the door to such testimony with evidence to the effect that Zona "had a mental and emotional problem"; that she had "no real conception" of the difference beween truth and falsity; and that she needed psychiatric "evaluation." Cf. United States v Shaw, 9 USCMA 267, 26 CMR 47. We conclude, therefore, there was no error in the admission of Dr. Wilder's testimony.

After argument on the granted issues, the accused filed a petition for new trial on the ground that part of a diary kept by Zona was suppressed "by officers of the court-martial." The record did not support the charge of suppression. The diary was found by the accused in Zona's room about the time of her initial disclosure of the accused's intimacies with her. According to the petition, the accused first turned over the diary to a lawyer who was engaged by the accused to represent him when the Office of Special Investigations began its investigation into Zona's disclosures. Later, the accused gave the diary to the Office of Special Investigations and received a receipt for it. There was no allegation that the accused thereafter requested its return. In fact, there was no allegation that the accused made any effort whatever to repossess the diary before October 1962, more than a year after his trial. What was alleged was that the accused's defense counsel at trial *"refused* to investigate the value of the diary even when advised of its content." This was nothing more than a variation of one of the original seventeen assignments of error in the petition for grant of review which charged defense counsel at trial with gross misrepresentation.[3] We considered and rejected the claim when we acted on the petition for grant of review.

We read the record of trial and we were impressed with the able and strenuous efforts of both individual defense counsel and appointed defense counsel in defense of the accused. They struck hard blows at Zona's credibility. That they did not succeed in securing an acquittal was not due to any apparent lack of effort, diligence or professional judgment on their part, but to the simple, obvious fact that the court-martial believed Zona. Her account of the accused's role in the incident with Airman Cook was corroborated in substantial detail by Cook. Zona's apparent truthfulness in regard to that occasion, and the lack of contradiction of the other specific incidents recounted by her, could reasonably have led the court-martial to believe her testimony that the offenses

[3] Ironically, thirteen of the other sixteen assignments of error, advanced by the accused in the petition for grant of review, were set out by trial defense counsel in a brief filed with the board of review. The two issues on which we granted review were raised in that brief. We agree with the board of review below that the "record reveals a vigorous and competent defense which zealously protected accused's rights and fought against conviction at every step of the way."

charged were committed. As to the diary, we found nothing in it which added materially to the evidence presented at trial. None of the thoughts and actions set out in it weighed against Zona's credibility any more than the evidence presented by the defense at trial. Accordingly, we found nothing in the petition for a new trial to justify the award of such relief.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

Judge FERGUSON concurs in the result.