UNITED STATES, Appellee

v

DONALD J. AYERS, Private, U. S. Marine Corps, Appellant

14 USCMA 336, 34 CMR 116

No. 16,856

January 3, 1964

*Lieutenant Colonel John R. DeBarr,* USMC, argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Charles B. Sevier,* USMC, and *Lieutenant Ronald S. Schwartz,* USNR.

*Major J. M. Detrio,* USMCR, argued the cause for Appellee, United States. With him on the brief was *Commander F. L. Forshee,* USN.

## Opinion of the Court

QUINN, Chief Judge:

Concerned about the absence of Take Ota, one of her waitresses, the proprietress of the Top Three Bar in Henoko, Okinawa, called the police. Police Officer Sakugawa broke into Take's apartment and found her dead body. An autopsy disclosed fifteen knife wounds on her face, back, and chest, and indicated that Take had been dead for several days. Death resulted from loss of blood from the severed carotid artery. Doctor Kuniaki Kinjo, a qualified pathologist who performed the autopsy, testified that the victim had also been choked before death, and suffered a fractured tongue bone.

Investigation of the homicide led to the accused and Private Calvin Nay. The latter admitted that on the morning of July 7, 1961, he and the accused perpetrated the crime, with the accused committing the actual act. He said that after the homicide, he and the accused searched the victim's room for a wallet belonging to the accused, which he had left with Take on the evening of July 6th. In the course of the search, another wallet was found which contained $23.00. The accused divided the money, giving Nay $10.00 and keeping $13.00 for himself "because he did the work." While in confinement pending trial on the present charge, the accused told one of the confinement personnel

that if he entered the accused's cell he would " 'cut . . . [him] to ribbons just like I stabbed that neisan—I stabbed her seventeen times, but I'll cut your throat from ear to ear.' "

The accused was tried for premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. Nay testified against him. The commission of the offense and the accused's role in it were compellingly established, and the accused was found guilty as charged. He was sentenced to dishonorable discharge, confinement at hard labor for life and accessory punishments. Intermediary authorities affirmed the findings of guilty and the sentence. On this appeal, the accused contends he was prejudiced by two allegedly erroneous rulings of the law officer excluding defense evidence, and by part of the law officer's instructions on the legal effect of certain circumstances surrounding the offense.

At trial, the accused testified in his own behalf. He admitted he and Nay left camp without authority and went to Take's apartment. He conceded he assaulted Take without provocation. First, he choked her; then he stabbed her with a knife he picked up from the stove. He and Nay searched for his wallet; when they found the one with the $23.00 in it, he divided the money,

taking the "extra $3 for the transportation to Koza" and for food and cigarettes. Answering direct questions by his counsel, he said he did not have "any intention of killing Take OTA" or of robbing her. Asked what his intentions were at the time he stabbed the victim, he said, "I don't know." On cross-examination, he testified he "wanted . . . [the victim] to stop screaming. That's all I was thinking about."

In his testimony, the accused indicated he ingested some kind of pills on a number of occasions. These pills were somewhat smaller than aspirin and bluish green in color. On June 21–22, he took forty such pills, along with some "sloe gin." Between 10:00 p.m. on July 6th and his departure from camp on the morning of July 7th, he purportedly ingested the "same" pills, had "one shot" of gin, and consumed several bottles of sake. He further testified that after ingestion of the pills the reactions he experienced at the time of the offense were the same as those he had had in June. However, in June, the accused passed into a state of unconsciousness and was hospitalized. During his stay in the hospital, which lasted about three or four days, he slept "almost all the time," and his main recollection of events was merely that he was "sacked in the rack." Contrastingly, at the time of the offense he felt he wanted "to keep moving all the time"; it was as though he had "springs" in his feet; and his breathing was "short" and "fast."[1] Also, instead of being rendered unconscious or substantially unaware of his surroundings and actions, the accused gave a very detailed account of what he did and said from the time he left camp to the time he killed Take, divided the money taken from her house, and fled to Koza, where he and Nay stayed for several days.

Before the accused took the stand, Corporal Rufus Alford testified as a defense witness. He was a member of accused's company and was the duty noncommissioned officer from 8:00 a.m., July 6th, to 8:00 a.m., July 7th. By "Marine Corps Order" the duty noncommissioned officer was required to maintain a log "of everything that goes on." A number of remarks regarding the accused were posted in the log. The first entry notes that at 11:15 p.m. the accused was detained at Battalion and placed in restriction. The last entry is as follows:

"0516 Saw Pvt Ayers & Pvt Nay in civilian cloth ask[ed] them where they were going & they said on liberty (Pvt Ayers was under the influence of Drug)."

When defense counsel offered the entire log in evidence, trial counsel consented, except as to the parenthetical remark on the accused's condition. He objected to that part because it represented an opinion the duty noncommissioned officer was "not qualified to give." After further testimony by Alford, the entry was again offered and again refused. If this were the whole

---

[1] There is also a significant difference in the number of pills the accused purportedly ingested on the two occasions. In June, he took forty pills; before the homicide he took either twelve or twenty, depending upon the interpretation placed on his testimony. At one point he testified as follows:

"Q. Would you describe the manner in which you took them and over what period of time?

"A. Well, when I first got them [about 10:00 p.m.] sir, I took about three or four of the pills and took them with a drink sir.

 . . . . .

"Q. At the time that you arrived . . . at the Main Gate, how many pills had you consumed out of this group that you purchased?

"A. Just three or four sir.

 . . . . .

"Q. Do you have any idea how many you had at this time?

"A. Well, I got to the barracks and another Marine and myself, *we split them up. I had approximately twenty to start with* and I had already taken three or four. And I had maybe fifteen or sixteen left sir." [Emphasis supplied.]

At another point in his testimony, the accused said:

"Q. How many of them did you take out there on the hill?

"A. Approximately 15 or 16, sir."

**339**

of the matter, the law officer's rulings were plainly correct. Although the details of the "Order" under which the log was maintained do not appear in the record, it is reasonably inferable from Alford's testimony that it required the recording only of actual facts or events. With some special exceptions, such as the opinion of a ▮▮▮▮▮▮▮ ▮ pathologist in an autopsy report, a statement of opinion is not the kind of "fact or event" entitled to admission in evidence as part of an "official" record or business entry. See Manual for Courts-Martial, United States, 1951, paragraph 144b, d; United States v LaRue, 11 USCMA 470, 29 CMR 286. Consequently, Alford's opinion as to the cause of the accused's apparent physical condition was not entitled to admission in evidence merely because it was noted in the duty log. However, going beyond the log, the accused contends Alford was qualified by experience to state his opinion, but was not allowed to give it by erroneous rulings of the law officer.

In several ways, defense counsel worked toward eliciting from Alford a direct statement of his opinion of the accused's condition. At one point, he asked Alford what he had "observed[d]" when he last saw the accused. Alford's answer was interrupted by trial counsel. It is as follows: "When I last saw him on that date I *assumed* that he was under the influence of ——." (Emphasis supplied.) Trial counsel objected to the answer as unresponsive to defense counsel's question. The objection was sustained. That ruling is patently correct. The witness was asked to state what he saw, not what he thought. Later, after Alford testified to his observations of the accused's appearance and actions, he was asked if he had had any experience "in observing persons . . . known to be under the influence of drugs." He replied that before he entered the Marine Corps, he had seen two persons take "an overdose" of heroin. His testimony continues as follows:

"Q. Now, did you make any observation on this morning of the

7th in relation to AYERS' condition regarding his being under the influence of alcohol. Did you form any opinion from his appearance at that time?

"A. No sir, I did not.

"Q. And did you form any opinion as to anything else that he might have been under the influence of?

"A. I formed myself an opinion that—

"TC: I object, Mr. Law Officer. The witness is not qualified to make an observation other than that the man appeared to be intoxicated. What might have caused his condition is not within the realm of this witness to voice an opinion upon.

"IC: I think, Mr. Law Officer, that we are getting here into an area in which we have the same standard which concerns itself about alcohol where a layman is able to give his opinion. Now, we have an entry in the log book here which is germane to this particulation [sic]. The entry was made by this witness. I think we are entitled to have his own conclusion for whatever it's worth, based upon his observation; upon his own experience.

"LO: I'm going to sustain the objection at this point, unless it is further established a proper foundation, for this witness.

"IC: Very well."

No further effort was made to obtain directly Alford's opinion as to the cause of the accused's condition. Instead, Alford merely testified to his observations of the accused's condition on June 22d, and his condition on the morning of July 7th. Defense counsel then again offered the log entry of Alford's opinion. As we pointed out earlier, that was properly excluded by the law officer. It was also proper for the law officer to sustain trial counsel's objection to Alford's testimony until a "proper foundation" was laid.

At trial, and in this Court, the accused's counsel have maintained that opinion testimony as to whether a person is under the influence of drugs

340

should be received upon the same basis and to the same extent as opinion testimony as to a person's state of sobriety. Opinion testimony on a ▮▮▮▮ person's state of intoxication, whether induced by scotch, whisky, rum, or any other alcoholic beverage, is normally allowed because it is a matter "commonly experienced," and usually is not "adequately . . . conveyed to the court by a mere recitation" of the facts observed by the witness. Manual for Courts-Martial, United States, 1951, paragraph 138e. However, it is doubtful indeed, and evidence in this case supports the doubt, that the observable effects of different drugs are so similar or so commonly known as to be best subsumed by the ordinary witness in the form of an opinion or conclusion. Assuming, without deciding the general validity of the defense thesis, the witness must have at least some competency to speak on the subject before he can offer his opinion. If he never previously saw a person under the influence of drugs or never previously read or heard anything about the nature of the physical conditions he observes in another, he is incompetent to conclude that such a person is under the influence of a drug. Alford testified that before he joined the Marine Corps he had seen two persons take an overdose of heroin. He did not describe the effects of this drug on these persons; and he was not asked whether the conditions he saw in these people resembled, or were the same as, those he witnessed in the accused. On the showing made, it was not unreasonable for the law officer to require additional evidence of Alford's competency to formulate an opinion on the subject. See United States v Hodges, 14 USCMA 23, 30, 33 CMR 235. Defense counsel availed himself of the opportunity to qualify the witness. He questioned Alford about his specific observations. Alford also compared the accused's condition on June 22d and July 7th; he said that on the first occasion the accused "was completely gone," while on the second he "wasn't quite completely gone." Alford's examination continued as follows:

"Q. I see. Could you tell us now upon what you based this entry that you made in the log book on the morning of the 7th? This one that appears on page 142 of exhibit G, these words in brackets . . . would you tell us now what it was that you based that entry upon?

"A. I based it upon my seeing him just before he completely left the area, I tried to catch him over to the movie and I physically seen him, that's what I based it on.

"Q. You based it on that observation?

"A. Yes sir, I did.

"DC: At this time we will offer into evidence that portion of the exhibit G, which has been withheld at this time '. . . up until this time, that sentence in brackets on page 142.

"TC: I wish to continue my objection, Mr. Law Officer. . . .

. . . . .

"LO: The objection is sustained.

"IC: Very well, we have no further questions of this witness."

However, defense counsel never asked Alford directly for his opinion. It ▮▮▮▮ would appear from the record that he thought he effectively got the point across to the court-martial in the questions quoted above. In any event, the record of trial shows that after the conditional ruling on Alford's competency to speak on the subject, he was never asked directly to state his opinion. We find no error in the law officer's rulings in the matter.

Accused's second claim of error concerns the law officer's exclusion from evidence of a hospital report showing that on June 22d, his blood had a barbiturate level of 42.0 micrograms per milliliter of blood. The report was offered in evidence by the defense after the accused had testified, and during the direct examination of Lieutenant Thomas E. Donnelly, a Navy doctor. Dr. Donnelly testified that the indicated level was "an intoxicating" or "poison-

ing" level. Since the accused did not describe the nature of the ▮▮▮▮▮ forty pills he ingested on that date, the report was competent evidence tending to show the pills were barbiturates. The report also tended to indicate that ingestion of forty such pills was likely to result in "poisoning" of the accused. We can agree with the accused, therefore, that the report was erroneously ruled out. However, we cannot see any basis from which it can reasonably be concluded that the accused was prejudiced by the ruling. On the contrary, identification of the pills taken on June 22d as barbiturates would have done the accused more harm than good.

The accused testified the June 22d pills were the "same" as those he took on the day of the offense. But his reactions, as he described them, are associated with amphetamine, rather than barbiturates. It will be recalled he said that before the offense he felt as if he had springs in his feet; that he was restless and he wanted to keep moving all the time; that his respiration was "short" and "fast." Dr. Donnelly, testifying as a defense witness, said that barbiturates have a depressing effect, which in the poisoning level results in total unconsciousness; conversely, amphetamine stimulates the nervous system, and increases the pulse and heartbeat. The following excerpt from his testimony deals with the specific symptoms related by the accused:

"Q. Are there any circumstances under which a barbiturate would cause a person to become antimated [sic] to develop springs in his feet so to speak, and to become restless, wakeful, sulky, irratable [sic]?

"A. Well these signs that you are mentioning here sir, are symptoms from—given—as far as amphetamine goes and all those are side effects are induced by amphetamines."

Dr. Donnelly also testified that barbiturates are sleep inducing, whereas an excess of amphetamine might in certain emotionally or mentally disturbed persons tend to increase restlessness to the point of bringing on a suicidal or homicidal tendency. He noted that

when barbiturates are taken with alcohol, it might "take twice the amount" of the drug to reach an intoxicant level. Since the accused had admitted consuming a considerable amount of sake on the day of the offense, but left unclear the amount of "sloe gin" he had on June 22d, identifying the June pills as barbiturate would have detracted materially from his effort to establish that at the time of the crime he was under the influence of drugs. The effect of the alleged ingestion of drugs on the accused's ability to premeditate or to entertain an intent to kill was submitted to the court-martial by appropriate instructions. On the record before us, we see no possible risk of harm to the accused by excluding the report of the June 22d barbiturate content of his blood.

For his final assignment of error, the accused contends he was prejudiced by the following instruction:

"In connection with this matter you are further instructed that a vicious assault resulting in multiple serious injury is evidence of a premeditated design to kill. This evidence is not conclusive, however, but is to be considered along with all the other evidence in the case."

The first sentence of the instruction was requested by trial counsel in an out-of-court hearing. Defense counsel said he did not "mind that being given," provided it was also indicated that the evidence of multiple serious injury must be considered with all the other evidence. Defense counsel also indicated he knew the proposed instruction was taken from the opinion of this Court in United States v Harris, 6 USCMA 736, 21 CMR 58. Defense counsel's reservation was accepted, and the law officer added the second sentence. Thereupon, defense counsel remarked, "That's all right."

Participation in the framing of an instruction, with acceptance of the final form, ordinarily precludes ▮▮▮▮▮ an attack on the correctness of the instruction on review of the conviction. See United States v Jones, 7 USCMA 623, 23 CMR

87; United States v Sanchez, 11 USCMA 216, 29 CMR 32. Whether the rule of waiver should be involved in this case need not detain us. In context, the instruction is essentially correct.

In United States v Harris, supra, page 741, we reviewed the sufficiency of the evidence to support █ a conviction for premeditated murder. In sustaining the findings of guilty, we said in part: "The vicious assaults resulting in multiple grievous injuries bespeak a premeditated design to kill, United States v Riggins, 2 USCMA 451, 9 CMR 81." The inference is grounded in common sense and ordinary experience. Wharton's Criminal Law and Procedure refers to the logic of the inference as follows:

"Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances of the case, such as . . . the presence of particular cruelty. . . ." [1 Wharton, Criminal Law and Procedure, § 267 (1957).]

Appellate or textbook language of the implication of certain evidence cannot always be used in an instruction to the court-martial because of the need to adapt the language to the particular facts in the case. United States v Gray, 9 USCMA 208, 212, 213, 25 CMR 470. Uncritical carry-over of a statement in an appellate opinion into an instruction may be misleading. Hansford v United States, 303 F2d 219 (CA DC Cir) (1962). In the present situation, characterization of an assault as "vicious" implies an evaluation of the circumstances surrounding the act. At the trial level, fact-finding is the function of the court-martial. The law officer may find it necessary to express his own views of the evidence, but he must take great care to guard against requiring the court to accept those views in their deliberations. See United States v Andis, 2 USCMA 364, 8 CMR 164; United States v Berry, 6 USCMA 638, 20 CMR 354. Possibly, a bare reference to the viciousness of the accused's act might erroneously be construed either as a direction to treat the act as vicious as a matter of law, or as an indication of the law officer's opinion. The present instruction is stated as a general inference that can be drawn from particular facts. It would have been better for the law officer to have been more explicit in informing the court-martial that it was not intended to suggest that the act alleged was vicious as a matter of law or personal opinion. It is, however, sufficiently free from ambiguity to withstand the accused's present attack. Reading the instruction in the context of the others on the requirements of proof, we are satisfied there is no reasonable risk it was construed by the court-martial as anything but advice on the permissible inference which could be drawn from the facts surrounding the homicide, and that the court fully understood it could accept or reject the inference. See United States v Miller, 8 USCMA 33, 23 CMR 257.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.