UNITED STATES, Appellee,

v.

**Thomas R. HOSKINS, Jr., Private First Class, U.S. Army, Appellant.**

No. 67,486.
CM 8903849.

U.S. Court of Military Appeals.

Argued Nov. 3, 1992.

Decided March 11, 1993.

For Appellant: *Dan R. Hyatt* (argued); *Captain Robert Lane Carey* (on brief).

For Appellee: *Captain Jane F. Polcen* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell 'Orto, Major Edith M. Rob,* (on brief); *Major Thomas E. Booth.*

*Opinion of the Court*

COX, Judge.

Appellant stands convicted of premeditated murder. The granted issue asks whether the evidence is legally sufficient to sustain the conviction. We must determine whether a reasonable factfinder could have found all the elements of the offense beyond a reasonable doubt; and in reviewing for legal sufficiency, we must consider the evidence in the light most favorable to the Government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 MJ 324 (CMA 1987).[1]

---

1. Appellant was tried by a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was convicted of pre- meditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. Appellant was sentenced to a dishonorable dis-

## FACTS

In its memorandum opinion, the Court of Military Review summarized the relevant facts as follows:

On 8 September 1989, appellant and four other members of his military police unit were assigned to guard ammunition which was being shipped by rail in Germany. Sergeant (SGT) Gibbs was the "guard commander." The soldiers lived in a guard car, a train car which was divided into several compartments: a shower, restrooms, kitchen, sink room, dayroom, seven sleeping compartments and a generator room. Private First Class (PFC) Haney, the victim, and Private (PVT) Hawley, the only female soldier on the mission, occupied the first sleeping compartment. SGT Gibbs, appellant, and PVT Tatay occupied the second sleeping compartment. The remaining sleeping compartments were used for storage or were unoccupied. On 22 September 1989, the train was on a railroad siding in Sythen, Germany. SGT Gibbs permitted appellant, PVT Tatay, and PVT Hawley to go into the nearby town to eat. Although drinking alcohol was prohibited while on the guard mission, the three soldiers purchased two bottles of brandy and ate dinner at an establishment. At dinner, appellant and PVT Tatay drank five beers each and PVT Hawley drank three beers. On the way back to the train, the three soldiers drank about half of one of the bottles of brandy. Upon arrival, they gave the remaining bottles of brandy to SGT Gibbs and PFC Haney. The five soldiers sat outside the guard car and drank. PVTs Hawley and Tatay became sick and went inside the second sleeping compartment. Appellant was put to bed in the first sleeping compartment by SGT Gibbs and PFC Haney.[2] PVT Tatay became ill and SGT Gibbs and PVT Hawley held him up so he could vomit out the window of the car. PFC Haney began to taunt PVT Tatay by saying that PVT Tatay "could not hang," PVT Tatay "needed a female to put him to bed," and that PVT "Tatay needed to go outside so he could teach him a lesson." SGT Gibbs and PVT Hawley restrained Tatay from exiting the compartment. At some point SGT Gibbs locked PFC Haney outside the compartment. PFC Haney continued to taunt PVT Tatay. Appellant approached PFC Haney three or four times telling him to calm down and forget it. This was observed by SGT Gibbs through the compartment windows.[3] According to PVT Hawley, PFC Haney told appellant to go back to bed, stated "do you want a piece of me now" and "nudged" appellant with his chest. Subsequently, a gunshot was heard. SGT Gibbs unlocked the compartment door. PFC Haney stated, "He shot me Gibbs, he shot me." SGT Gibbs saw appellant standing near the doorway of the dayroom with a .45 pistol in his hand and about ten to twelve feet from PFC Haney. SGT Gibbs ordered appellant to put the pistol down. SGT Gibbs withdrew his head inside the

---

charge, confinement for life, total forfeitures, and reduction to Private E–1. The convening authority reduced the period of confinement to 40 years but otherwise approved the sentence; the Court of Military Review affirmed the findings and the approved sentence.

2. Appellant was so intoxicated that Sergeant Gibbs and PFC Haney had to undress him and put him to bed.

3. Sergeant Gibbs was inside the sleeping compartment which has a door that is glass from the waist up. The walls of the compartment are thin, and what was said outside the compart-

ment could be heard. During the commotion outside the compartment, Sergeant Gibbs was physically restraining PVT Tatay from starting a fight with PFC Haney by sitting on him and holding him down. At one point, PVT Tatay shoved Sergeant Gibbs against PVT Hawley. Sergeant Gibbs was unable to verbally control his subordinates.

As a consequence of his own derelictions that evening, Sergeant Gibbs himself was court-martialed. In exchange for his pleas of guilty to numerous offenses, the Government agreed to drop certain other charges and to limit his sentence.

compartment as three additional shots were fired by appellant.[4] SGT Gibbs again told appellant to put the pistol down. Appellant answered, "Hell, the gun is down."[5] Later, SGT Gibbs found the pistol on the table in the dayroom. He took the magazine from the pistol. He took the pistol belts, which contained all the ammunition for the pistols, from the gun rack and tossed them under the railroad car.

Appellant was then observed by PVTs Tatay and Hawley putting on his shorts in the "sink room." He stated to them that PFC Haney was dead and that "he didn't have to put up with this kind of shit where he came from, and not to worry because they weren't going to be in trouble." When SGT Gibbs reentered the car, appellant was smoking a cigarette and stated, "I killed him, I killed him." Appellant did not attempt to render first aid to PFC Haney. SGT Gibbs handcuffed appellant to the window. He and PVT Hawley rendered first aid to PFC Haney.

Medical personnel and police arrived at the scene. PFC Haney was taken to a hospital. He had a gunshot wound to the chest, the abdomen and to the thigh. Eight days later, PFC Haney died as a result of the gunshot wounds.

The main thrust of appellant's defense was self defense and defense of another. In his defense, he testified that he had been drinking, went to sleep in the compartment, and was awakened by noise in the next compartment. He saw PFC Haney jerking on the other compartment door shouting, "You need a woman, you need a woman." He believed Haney was very angry. He thought the statements by PFC Haney were sexual comments directed at PVT Hawley because of prior crude sexual comments by Haney directed to Hawley. He believed PFC Haney was going to rape Hawley. He also throught PFC Haney was trying to kill PVT Tatay. Appellant approached Haney and told him to stop. He stated that PFC Haney threatened to "kick [Tatay's] head in" and stated, "I'm going to kill the little bastard." PFC Haney threatened "to kick my ass" and asked, "Do you want some of me." He shoved appellant down the hall and into the dayroom where he fell down. Appellant grabbed a pistol from the gun rack and "charged it." He testified that he approached PFC Haney thinking PFC Haney wouldn't attack him because he had a gun. When Haney saw the gun, he became very angry and stated "if you shoot me you better kill me." He testified PFC Haney continued to jerk on the compartment door. When he told PFC Haney to stop, PFC Haney turned on him, stated "I'll take that gun and I'll blow your god damn head off," and swung at appellant. He testified that the blow missed his face, just grazing him. He backed up and fired until PFC Haney stopped coming at him.

Unpub. op. at 2–4.

## DISCUSSION

■ We next apply this evidence to the elements of premeditated murder. Those are:

(a) That a certain named or described person is dead;

(b) That the death resulted from the act or omission of the accused;

(c) That the killing was unlawful; and

---

**4.** After he shut the door, Sergeant Gibbs "grabbed PVT Hawley because she was hysterical."

**5.** Sergeant Gibbs' testimony does not clarify the amount of time between the first shot and the subsequent three. The record repeatedly notes the witness' description of the timing of shots as "Bang, [one second pause] bang, bang, bang [consecutively]." On each occasion the record reflects a pause of one second. Sergeant Gibbs testified that he heard the shot, stuck his head out of the compartment, closed the compartment door, told appellant to put the gun down,

and then appellant fired three more shots. He said "all of this happened so quick." Yet when asked to estimate the interval between the first and second shots, Sergeant Gibbs replied, "Between 10 and 20 seconds I would imagine. Everything just happened so fast." He subsequently admitted that he could not precisely "quantify" the period in seconds. However, premeditated design need not be "entertained for any particular ... length of time." *United States v. Teeter*, 16 MJ 68, 71 (CMA 1983). *See also* para. 43c(2)(a), Part IV, Manual for Courts-Martial, United States, 1984.

(d) That, at the time of the killing, the accused had a premeditated design to kill.

Para. 43b(1), Part IV, Manual for Courts–Martial, United States, 1984. The Manual further provides:

A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intent to kill someone *and consideration of the act intended.* It is not necessary that the intention to kill have been entertained for any particular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution. The existence of premeditation may be inferred from the circumstances.

Para. 43c(2)(a) (emphasis added). *See United States v. Teeter,* 16 MJ 68, 71 (CMA 1983); *United States v. Ayala,* 22 MJ 777, 797 (ACMR 1986), *aff'd,* 26 MJ 190 (CMA 1988). "The words consideration of the act intended to bring about death' are not terms of art. They have ordinary meanings." *United States v. Teeter,* 16 MJ at 72.

■■■ As the Court of Military Review stated in *United States v. Viola,* 26 MJ 822, 829 (ACMR 1988), *aff'd,* 27 MJ 456 (CMA 1988) (sum. disp.), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989):

Intent to kill alone is insufficient to sustain a conviction for premeditated murder. *See* W. LaFave and A. Scott, *Criminal Law,* § 73 (1972). *See also* F. Bailey and H. Rothblatt, *Crimes of Violence: Assault and Homicide,* § 550 (1973), *and* C. Torcia, *Wharton's Criminal Law,* (14th ed.), § 140 (1979). To sustain such a conviction, the killing must have been committed after reflection by a cool mind. *Id.*

*See also United States v. Cooper,* 28 MJ 810, 816 (ACMR 1989), *aff'd,* 30 MJ 201

(CMA 1990). We must find that there is more than evidence of intent before we can affirm the decision below in this case; what we must also find is evidence of a "premeditated design to kill." Premeditation requires that one with a cool mind did, in fact, reflect before killing. W. LaFave and A. Scott, *Substantive Criminal Law* § 7.7(a) (1986):

It has been suggested that for premeditation the killer asks himself the question, "Shall I kill him?" The intent to kill aspect of the crime is found in the answer, "Yes, I shall." The deliberation part of the crime requires a thought like, "Wait, what about the consequences? Well, I'll do it anyway."

*Id.* at 237 n.6.

The facts of this case are sufficient for a reasonable factfinder to infer intent. However, we are troubled by the paucity of evidence of prior "consideration of the act intended." Para. 43c(2)(a). We note that the forensic pathologist who performed the autopsy on the deceased found only three bullet wounds. One struck the deceased's left center chest; a second hit his mid abdomen; and a third hit his right thigh. The chest wound resulted in his death; however, the firing sequence could not be determined.

As the pathologist testified:

I don't think there's grounds to make an assumption on sequence of fire other than that the wound in the abdomen was probably the middle one. The way these wounds are distributed suggests that either the person firing was on the radius of a circle or the victim turned while he was being shot. So if the chest wound were first, then as he turned to the left, the abdominal wound came second and he continued to turn to the left and then the leg wound was third. But if you reverse the order, if he'd been roughly facing right side toward the shooter, [he would] ha[ve] gotten the leg wound first, then the abdominal wound, and then the chest wound last. Either one is a reasonable explanation for what I see from my viewpoint.

In this case, we can detect *no* evidence from which the factfinder could infer that appellant "premeditated" *before* firing the first shot. The Government's primary witness, Sergeant Gibbs, gave internally inconsistent testimony. While circumstantial evidence, such as evidence of planning the activity or evidence of motive, may be used to prove premeditation, there was no such proof here. Granted, as the dissenters point out, it is possible that the members inferred premeditation *after* the first shot, but *before* the second, third and fourth shots. *See* n.[5], *supra.* However, the uncontroverted evidence in this case is that only one of the wounds was fatal; therefore, the evidence must prove that appellant premeditated *before* inflicting that wound. In other words, for the conviction to be sustained, the evidence must show that the fatal wound was *not* a result of the first shot. We are simply unable to conclude, on this record, that there is sufficient evidence that appellant, with a cool mind, reflected on the consequences of his actions before firing the first shot.

Therefore, we hold, as a matter of law, that the evidence is insufficient to sustain appellant's conviction of premeditated murder.

The decision of the United States Army Court of Military Review is reversed as to the specification of the Charge to the extent that it alleges premeditated murder and the sentence. The finding of guilty of premeditated murder is set aside, and that portion of the specification is dismissed. The decision below is affirmed as to this specification to the extent that it alleges unpremeditated murder. The record of trial is returned to the Judge Advocate General of the Army for submission to that court for reassessment of the sentence based on the affirmed findings.

Judges GIERKE and WISS concur.

SULLIVAN, Chief Judge (dissenting):

The question before this Court is one of law, not fact. *See United States v. Harper*, 22 MJ 157, 161 (CMA 1986). More particularly, it is whether there was sufficient evidence from which a reasonable factfinder could "find or infer beyond a reasonable doubt" that appellant killed his victim with premeditation. I note that premeditation can be shown by evidence of the circumstances surrounding the killing. *See United States v. Teeter*, 16 MJ 68 (CMA 1983); *United States v. Ayers*, 14 USCMA 336, 34 CMR 116 (1964). Accordingly, for the reasons noted below, I disagree with the majority opinion's insufficiency-of-the-evidence holding.

First, the majority opinion holds that the evidence in this record indicates an absence of planning and motive. However, the majority has cited no authority, and I cannot find any authority, for requiring such proof to show premeditation. Moreover, regarding proof of motive, this Court has expressly held that this type of evidence is not required to show intent. *See United States v. Varraso*, 21 MJ 129, 134 (CMA 1985), *cert. denied*, 475 U.S. 1124, 106 S.Ct. 1645, 90 L.Ed.2d 190 (1986). In any event, there was ample evidence in this case that appellant's peacemaking efforts had been unceremoniously rejected by the victim who further challenged him to fight.

Second, the majority opinion also finds no other relevant evidence that appellant premeditated the murder. However, the record shows that multiple shots were fired at the victim which in itself is some evidence of premeditation. *See United States v. Teeter*, 16 MJ at 71; *United States v. Ayers*, 14 USCMA at 343, 34 CMR at 123; *United States v. Thomas*, 6 USCMA 92, 96–97, 19 CMR 218, 222–23 (1955). Moreover, there was some evidence that appellant fired his last 3 shots some 10 to 20 seconds after Sergeant Gibbs told him to put his gun down. *See United States v. Ransom*, 4 USCMA 195, 201, 15 CMR 195, 201 (1954). This evidence, coupled with the previously noted evidence of motive, was sufficient to permit a rational finding of premeditation.

Nevertheless, the majority opinion strictly requires proof of premeditation *before* the first shot. It bases this requirement on

"uncontroverted evidence ... that only one of the wounds was fatal." 36 MJ at 347. This single-bullet theory, however, is not uncontroverted in the record.

In this case, there was ample evidence that the victim did not die instantaneously from the first shot. In fact he died in a hospital eight days after the shooting. Moreover, Dr. Hause, a government witness and the forensic pathologist who performed the autopsy on the victim, testified that "[t]he accused's [sic] death was caused by *three* gunshot wounds." (Emphasis added.) The autopsy report similarly listed the "CAUSE OF DEATH" as "Multiple Gunshot Wounds." Dr. Hause also defined "cause of death" as "that event or disease process which sets in motion a chain of physiologic alterations which lead to death." While testifying during direct examination, he described "[t]he mechanism [of death], *at least partially*, is that the wound that Haney had through his chest passed through his sac that surrounds his heart[.]" (Emphasis added.) Therefore, there was also legally sufficient evidence presented to the members from which they could find or infer that all three gunshot wounds together set into motion the physiologic alterations which led to Haney's death.

CRAWFORD, Judge (dissenting):

I agree with the Chief Judge's analysis of the evidence in his dissenting opinion and write only to underscore the standard of review which federal appellate courts should apply.

In my view, under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard, the facts of this case are sufficient for a reasonable factfinder to infer premeditation, and in fact a panel composed of officer and enlisted members did so.

As an appellate court we are not asked whether we believe one set of circumstances over another set of circumstances. As a factfinder in this case, I might have reached a different conclusion. But an appellate court is not a factfinder. Under the *Jackson* standard all reasonable inferences are to be drawn in favor of the Government; that includes the reasonable inference that it was the last shot which was the fatal shot in this particular case. We should reaffirm the *Jackson* standard to ensure predictability and finality. Therefore, I respectfully must dissent.