*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
GASTON, STEPHENS, and STEWART
Appellate Military Judges

_____

**UNITED STATES**
*Appellant*

**v.**

**Craig R. BECKER**
Lieutenant (O-3), U.S. Navy
*Appellee*

**No. 201900342**

Decided: 25 February 2021

Appeal by the United States Pursuant to Article 62, UCMJ

Military Judge:
Aaron C. Rugh

Arraignment 13 February 2019 before a general court-martial convened at Naval Base San Diego, California, consisting of officer members.

For Appellant:
*Major Kerry E. Friedewald, USMC* (argued)
*Lieutenant Joshua C. Fiveson, JAGC, USN* (on brief)
*Lieutenant Clayton L. Wiggins, JAGC, USN* (on brief)

For Appellee:
*Lieutenant Daniel O. Moore, JAGC, USN* (argued)
*Captain Marcus N. Fulton, JAGC, USN* (on brief)

Senior Judge GASTON delivered the opinion of the Court, in which Judge STEWART joined. Senior Judge STEPHENS filed a separate dissenting opinion.

_____

**PUBLISHED OPINION OF THE COURT**

_____

GASTON, Senior Judge:

This case is before us on a second interlocutory appeal pursuant to Article 62(a)(1)(B), Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 862(a)(1)(B). Appellee is charged with assault consummated by a battery, conduct unbecoming an officer and a gentleman, and premeditated murder for allegedly strangling his wife in August 2013, physically and emotionally abusing her over the following two years, and then drugging her and causing her to fall from a seventh-floor apartment window to her death in October 2015.

The Government seeks to admit certain prior statements by the decedent, Mrs. Becker, under the forfeiture-by-wrongdoing exception to the Sixth Amendment Confrontation Clause and the hearsay rule. After two Article 39(a), UCMJ, hearings, the military judge ruled some of the statements inadmissible. On the Government's first appeal, we found the judge's ruling employed the wrong legal standard and vacated and remanded it for further consideration. *United States v. Becker*, 80 M.J. 563 (N-M. Ct. Crim. App. 2020) [*Becker I*]. On remand, after receiving additional briefing, the military judge reconsidered the evidence in light of our decision, adopted his prior findings of fact, and ruled the same statements inadmissible. The Government appeals this second ruling, which we find erroneous due to its failure to consider important facts.

## I. BACKGROUND[1]

On 8 August 2013, Mrs. Becker was awakened around 2300 in a U.S. Army hotel by Appellee dragging her out of bed by the arm and shirt. The couple had just transferred to Belgium, and Appellee had been going through

_____

[1] As decisions on preliminary questions such as the admissibility of evidence are not bound by the rules of evidence, *see* Mil. R. Evid. 104(a), we assert no opinion about whether the facts discussed herein could be proven at trial, let alone whether the charges against Appellee could be proven beyond a reasonable doubt. We provide this factual background based on our review of the record only for purposes of assessing whether the trial court erred by failing to consider important facts in its ruling.

her laptop and became angry when he found a suggestive email between Mrs. Becker and another man. Mrs. Becker admitted having an affair with one of Appellee's former Navy colleagues in Virginia. The conversation became heated, turned to dissolution of the marriage, and a struggle ensued over the laptop. After grabbing and shoving her away from him repeatedly, Appellee eventually picked Mrs. Becker up, carried her to the bed, and pinned her down with his hands around her neck until she was unable to breathe.

Soon afterward, Mrs. Becker reported what happened to the hotel front desk clerk, who observed she had marks on her face and neck and appeared to have been crying. Military police were notified and interviewed both Appellee and Mrs. Becker. Appellee denied the allegations and said he had only hugged his wife tightly in order to keep her from hitting him. Mrs. Becker gave oral and written statements alleging this was not the first of the couple's physical altercations, which she said had happened four or five times previously with escalating severity. She stated that approximately six weeks prior Appellee had pushed her backwards and injured her ankle. This time, she said he tightened his hands around her neck with such force that she felt her life was in danger. She said he also took her identification and credit cards and changed their bank account passwords, effectively leaving her isolated and trapped.

After attending counseling with Appellee the following evening, Mrs. Becker recanted her allegations, which led to the criminal investigation and all formal action on the allegations being formally closed eight months later. Mrs. Becker nevertheless maintained to friends and family members that the allegations were true, that she had felt her life was in danger, that she had recanted only to save Appellee's military career, that she was afraid of what he would do if he lost his career, and that his controlling, abusive behavior toward her continued in the ensuing months.

In early September 2015, Appellee discovered Mrs. Becker was having another affair while he was going through the text messages on her cellular phone. He had a visceral reaction to this discovery, confronted her about it, and she admitted it. They began sleeping in separate rooms in their apartment in Mons, Belgium, and Mrs. Becker told Appellee she wanted to separate. On 18 September 2015, they signed a separation agreement that would keep them somewhat connected for purposes of supporting and raising their infant daughter and pursuing an ongoing business venture.[2] After signing

---

[2] The agreement also referenced Appellee's ongoing fight to gain custody over his two sons from a prior marriage.

the separation agreement, Mrs. Becker began taking their daughter with her to sleep at her new boyfriend's house, further angering Appellee,[3] before eventually signing a lease for her own apartment, where she and their daughter would live apart from Appellee.

On 6 October 2015, Appellee went to a Belgian police office and reported that he was concerned about the people—including her new boyfriend—whom Mrs. Becker had invited to help her move to her new apartment. Appellee asked the police to make a written record of his visit. He later stated he went to the police because during their disagreements over who would move her things, Mrs. Becker "made [him] understand that she was going to cause [him] problems."[4] Appellee also reported that Mrs. Becker was an alcoholic, that she drank one-half to three-quarters of a bottle of wine five nights a week, and that her drinking affected her emotional state. That same day, he bought a bottle of wine for their seventh-floor apartment.

Two days later, Mrs. Becker died after falling from a window of that apartment. At around 2100 that evening, witnesses heard a woman screaming from a high window of an apartment building, sounding panicked and afraid. A nurse taking out the garbage saw the woman tilt backwards out of the window, strike the building as she toppled downward, and then grab the edge of a window, trying not to fall, until she was unable to hold on and fell screaming to the ground. A couple walking nearby heard the initial scream, two or three cries of "Help," and then a long scream of "Aaahh" ending in a thud. They found the woman lying on her back at the bottom of the building, arms in the air, moaning and bleeding from her head. Another bystander, a woman in her fifties, visibly shocked by what she had just witnessed, said a man had just pushed the woman out of a window.

The couple looked up and saw a man looking down from a window at the woman on the ground. After a while, the man came down speaking on the telephone. He was not crying and did not appear sad, but was nervously walking around. After he hung up his phone, the man spoke to the woman lying on the ground.

When the Belgian police arrived, they spoke to the man—Appellee. He told them his wife had jumped from her bedroom window after drinking wine and taking medicine earlier in the evening. He said he had put her to bed

---

[3] Appellee texted a friend on 26 September 2015, "That piece of s[***] has the baby over [sic] her boyfriends." App. Ex. VI, Gov. Ex. 58 at 1.

[4] App. Ex. VI, Gov. Ex. 25 at 40.

after dinner, later heard a scream while he was speaking on the phone, and entered her bedroom just as she went out the window. He took them to the seventh-floor apartment and showed them the window. Beneath it, there were long scrapes down the side of the building apparently left by Mrs. Becker's fingernails as she tried to stop her fall. The police found Mrs. Becker's cellular phone on a couch in the living room. Appellee told them he did not know its security code.

After Mrs. Becker died from her injuries, Appellee told her father the following day that when he spoke to her as she lay on the ground, she told him, "You did this to me." During follow-up interviews with the Belgian authorities, Appellee said she told him, "I'm scared" and "I love you." Appellee denied hearing her cry, "Help," denied looking down from the window to where she fell, denied any feelings of jealousy about her being with another man, and denied ever being violent with her in the past. He said he later guessed the security code to Mrs. Becker's cellular phone and found messages sent from the phone to her new boyfriend just prior to her death. The messages stated that she saw a change in Appellee and still loved him, but that Appellee did not want her back because of the affair, and ended by stating, "F[***] my life."[5] A comparison with Appellee's phone records indicates the messages were sent during times when Appellee was not using his own cellular phone that evening.

A toxicological examination revealed that at the time of her death Mrs. Becker's blood alcohol content was negative, but that zolpidem and a high level of tramadol were present in her system. Tramadol is a morphine-based pain reliever that can cause sleepiness or altered consciousness. Zolpidem is a sedative, and can be prescribed in small, round, pink pills. A work colleague of Appellee's reported that a day or so before Mrs. Becker's death Appellee had picked up a small bag of small, round, pink pills from his old office.

Two days after his wife's death, Appellee spoke on the phone with one of her friends from home. He brought up things Mrs. Becker had done in the past to hurt him. One of the things he discussed was that Mrs. Becker had made his life a "living nightmare" when she told the police he was violent with her in the U.S. Army hotel in August 2013, which led to an eight-month investigation. He also discussed his ongoing child-custody dispute over his two sons from a former marriage, whom he had not told about Mrs. Becker's death, fearing it might get back to his ex-wife and affect his custody case.

---

[5] App. Ex. VI, Gov. Ex. 25 at 15.

## II. Discussion

We have jurisdiction over this appeal under Article 62(a)(1)(B), which authorizes the Government to appeal a ruling "which excludes evidence that is substantial proof of a fact material to the proceeding." The evidence ruled inadmissible by the military judge—Mrs. Becker's follow-up statements and formal report of abuse to military police in August 2013, her statements to friends regarding the August 2013 incident, and her statements to friends and family members regarding Appellee's alleged physical and emotional abuse between August 2013 and October 2015—meet that definition.

### A. Forfeiture by Wrongdoing

The Sixth Amendment Confrontation Clause provides that in all criminal prosecutions, an accused shall have the right "to be confronted with the witnesses against him." Out-of-court statements that are "testimonial" are generally barred by the Confrontation Clause unless the declarant is unavailable to testify as a witness and the accused had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36 (2004). "Testimonial" statements are, generally speaking, formalized statements that report allegations of past criminal conduct for potential use in future proceedings. *See Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding that statements are testimonial when circumstances objectively indicate that "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution").

An exception to the Confrontation Clause, rooted in common law, is forfeiture by wrongdoing, which holds that an accused cannot complain that his right to confront a witness is violated if his own acts, or acquiescence in some act, are what made the witness unavailable in the first place. This exception "extinguishes confrontation claims on essentially equitable grounds." *Crawford*, 541 U.S. at 62. It is woven into the constitutional fabric because its absence "would create an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them." *Giles v. California*, 554 U.S. 353, 365 (2008).

As the Supreme Court explained in *Giles*, the forfeiture-by-wrongdoing exception at common law permitted the introduction of statements of witnesses who were kept from testifying by the "means or procurement" or "contrivance" of the defendant. *Id.* at 359-60. In light of the definition and connotation of these terms, the Court found the exception was historically used where witnesses were kept away through "planning, scheming, or stratagem." *Id.* at 361. Based on case precedents and the general maxim upon which the exception is based—that a criminal defendant "should not be permitted to benefit from his own wrong"—the Court determined that "the

exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." *Id.* at 367.

The exception thus has two components: (1) the party against whom the statement is offered wrongfully caused the declarant's unavailability as a witness; and (2) the party's conduct was intended or "designed" to produce that result. *Giles*, 554 U.S. at 360-61.[6] With respect to the second requirement, that the wrongdoing is intended or designed to cause the declarant's unavailability as a witness, a number of observations are in order.

First, the law recognizes that multiple intents or motives may be at work in a single, wrongful action. *See, e.g., United States v. Jackson*, 706 F.3d 264, 269 (4th Cir. 2013) (rejecting a narrow view of the intent requirement and noting that "the [*Giles*] Court made no mention of any requirement that the defendant's desire to silence the witness be the sole or primary motivation for his misconduct."). Consequently, as we have previously explained, "the conduct rendering the declarant unavailable need not have been motivated *solely* by a desire to prevent the declarant from testifying as a witness, so long as it was *a* motivation." *Becker I*, 80 M.J. at 568 (emphasis in original) (citing *Jackson*, 706 F.3d at 269 (finding that to allow defendants with multiple motives for their actions to murder, intimidate, or injure potential witnesses and then claim their confrontation right would impermissibly erode the rationale behind the exception)).

Second, the intent to cause the declarant's unavailability as a witness need not be in reference to a particular criminal proceeding, or any proceeding at all for that matter. The intent could be to prevent the witness from testifying in a civil proceeding, such as a divorce or child custody hearing. *See People v. Peterson*, 106 N.E.3d 944, 963-65 (Ill. 2017) (citing *Giles*, 554 U.S. at 377). Nor must any legal proceeding, civil or criminal, be in existence at the time of the wrongdoing. *See id.* at 964; *Becker I*, 80 M.J. at 568 ("[T]he doctrine applies equally to wrongdoing to prevent testimony and to wrongdoing to prevent testimonial statements, such as formal reporting to law enforcement."). There need not be a criminal investigation or charges pending or even contemplated at the time of the wrongdoing. *See Becker I*, 80 M.J. at 569 (finding the exception applies "irrespective of whether criminal charges are

---

[6] As the exception has also been codified as an exception to the hearsay rule, Military Rule of Evidence 804(b)(6), it applies equally to non-testimonial hearsay that is not barred by the Confrontation Clause. *See Becker I*, 80 M.J. at 567 n.8 (collecting cases). Thus, our discussion here applies to both the constitutional and the hearsay exceptions.

reasonably foreseeable at the time of the conduct"). In the context of domestic abuse, for example, the Supreme Court has recognized that since "[a]cts of domestic violence often are intended to dissuade a victim from resorting to outside help, . . . the evidence may support a finding that the crime expressed the intent *to isolate the victim and to stop her from reporting abuse to the authorities* or cooperating with a criminal prosecution—rendering her statements admissible under the forfeiture doctrine." *Giles*, 554 U.S. at 377 (emphasis added).

Third, the wrongdoer's intent to cause the declarant's unavailability as a witness need only be subjectively held; it need not be reasonable in any objective or measurable way. Thus, the focus of the assessment is on the wrongdoer, not the declarant. Even if the declarant had no present intention of reporting abuse to the authorities or testifying at a future civil or criminal proceeding that was not then pending, but the wrongdoer's actions were nevertheless intended or designed to prevent her from doing so, this would trigger forfeiture by wrongdoing. As we stated during the Government's first appeal,

> *Giles* . . . envisions unconfronted, testimonial statements potentially being rendered admissible where a prior abusive relationship suggests that a wrongful act is performed with an intent to prevent the witness not only from testifying at some formal proceeding, but also from reporting abuse, cooperating with law enforcement, or resorting to outside help . . . .

*Becker I*, 80 M.J. at 569. To that end, it is well established that motive and intent are rarely proven by direct evidence and often "must be inferred from conduct and the surrounding circumstances." *Peterson*, 106 N.E.3d at 961 (citations omitted); *see also* Rule for Courts-Martial 918(c), Discussion (defining "circumstantial evidence," from which motive and intent may be inferred, as "evidence which tends directly to prove not a fact in issue but some other fact or circumstance from which, either alone or together with other facts or circumstances, one may reasonably infer the existence or non-existence of a fact in issue.").

Finally, in assessing the wrongdoer's intent, while "[t]here is no general rule for determining or comparing the weight to be given to direct or circumstantial evidence," *id.,* the trial court must take into account the totality of the circumstances, including not only the broader context of the wrongful act, but also its "immediate circumstances." *See State v. McKelton*, 70 N.E.3d 508,

546 (Ohio 2016).[7] This is particularly important where there is evidence of calculation or premeditation in the wrongful act that renders the declarant unavailable as a witness, since the forfeiture-by-wrongdoing exception's very existence is to prevent wrongdoers from benefitting from such action through planning, scheming, or stratagem. In *McKelton*, for example, where the appellant was accused of killing his girlfriend after previously assaulting her—but the prosecution's theory was that the killing of the victim "was spontaneous" and "wasn't planned"—the court found the *lack* of planning weighed against finding that the purpose behind the killing was to prevent the victim's testimony about the other offenses. *Id.* at 545-46 (ultimately finding sufficient evidence of intent based on the violent history between the appellant and the victim).

In contrast to wrongdoing committed in the heat of sudden passion as a result of fear or rage, premeditated wrongdoing is "committed after reflection by a cool mind." *United States v. Hoskins*, 36 M.J. 343, 346 (C.M.A. 1993) (quoting *United States v. Viola*, 26 M.J. 822, 829 (A.C.M.R. 1988), *aff'd*, 27 M.J. 456 (C.M.A. 1988) (summ. disp.)). Implicit in such cool reflection is the potential for multiple motives for the same wrongful act. *See, e.g., United States v. Davis*, 49 M.J. 79, 84 (C.A.A.F. 1998) (finding evidence of "multiple motives" for the appellant's attempted premeditated murder of his wife, including pressure from his mistress to end his marriage and the alleviation of financial problems through his wife's life insurance). Hence, where there is evidence that the wrongdoing causing a declarant's unavailability as a witness was calculated or premeditated, the trial court must closely examine whether multiple layers of motive and intent are at play, to include things like keeping a witness from reporting criminal acts or other abusive behavior, cooperating with law enforcement, participating in civil or criminal proceedings, or resorting to outside help.

In laying the predicate for the forfeiture-by-wrongdoing exception, the Government's burden is to establish by a preponderance of the evidence that an accused wrongfully caused or acquiesced in wrongfully causing the declar-

---

[7] This rule applies irrespective of the type of case at hand. As the Supreme Court appropriately found in *Giles*, there is not "one Confrontation Clause (the one the Framers adopted and *Crawford* described) for all other crimes, but a special, improvised, Confrontation Clause for crimes that are frequently directed against women." *Giles v. California*, 554 U.S. 353, 376 (2008). Whether it involves domestic violence, bank fraud, or a narcotics ring, the type of case merely helps inform what facts and circumstances must be taken into account in assessing the intent behind the wrongful act that renders the declarant unavailable as a witness.

ant's unavailability as a witness and did so intending that result. *Accord United States v. Johnson*, 767 F.3d 815, 822-23 (9th Cir. 2014) ("[I]n order to introduce evidence under the forfeiture exception, the Government must demonstrate by a preponderance of the evidence that the defendant intentionally secured the declarant's absence."); *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2013); *Perkins v. Herbert*, 596 F.3d 161, 167 (2d Cir. 2010). *See also* Fed. R. Evid. 804(b)(6) advisory committee's note to 1997 amendment ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior the new Rule 804(b)(6) seeks to discourage.").

## B. Analysis of the Trial Court's Ruling

In this case, Appellee is charged with premediated murder in connection with allegedly drugging Mrs. Becker and then causing her to fall from a seventh-floor apartment window, in the context of prior acts of physical and emotional abuse. Based on an extensive record of witness testimony and documentary evidence, the Government asserts that at least part of Appellee's intent in killing Mrs. Becker was to cause her unavailability as a witness, and argues that in reaching the opposite conclusion the trial court erroneously failed to consider important facts bearing on Appellee's intent.

In an interlocutory appeal under Article 62, we review the military judge's decision "directly" and review the evidence "in the light most favorable to the party which prevailed at trial." *United States v. Henning*, 75 M.J. 187, 190-91 (C.A.A.F. 2016) (citation and internal quotation marks omitted). We review rulings to admit or exclude evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013). It is an abuse of discretion if the military judge (1) "predicates his ruling on findings of fact that are not supported by the evidence," (2) "uses incorrect legal principles," (3) "applies correct legal principles to the facts in a way that is clearly unreasonable," or (4) "fails to consider important facts." *United States v. Commisso,* 76 M.J. 315, 321 (C.A.A.F. 2017) (citations omitted).

On remand from our previous decision, after receiving additional briefing from the Government, the military judge adopted his prior ruling's findings of fact, which discuss the 2013 incident at the U.S. Army hotel, Mrs. Becker's subsequent statements about Appellee's abusive and controlling conduct, Appellee's reaction to the second affair, and the Beckers' separation in the weeks leading up to Mrs. Becker's death. Regarding the more immediate circumstances of Mrs. Becker's death, the ruling provides the following facts:

> On 8 October 2015, Mrs. Becker signed a lease on an apartment for which she purchased a clothes washer and dryer. She gave the property owner a 500 Euro deposit at the same

time. She then lunched with several co-workers where she appeared upbeat and talked about leaving for China the next morning on a business trip related to the joint business. Although she had been staying [with] friends on most nights, that night she returned to the apartment she shared with the accused to eat dinner and put their daughter to bed.

At around 2100 on 8 October 2015, witnesses heard a scream and saw Mrs. Becker fall from her seventh story apartment onto the ground. She was still alive as several witnesses gathered around her. The accused arrived shortly thereafter, and knelt down next to Mrs. Becker. Witnesses then observed the accused and Mrs. Becker speak to each other.

The next day, the accused told [Mrs. Becker's father] that Mrs. Becker spoke to him during this exchange saying, "you did this to me." Several days later, the accused would tell authorities that Mrs. Becker instead said "I'm scared" and / or "I love you" during these last minutes.

Mrs. Becker was taken to the hospital but died within an hour of falling.[8]

These facts, while all certainly relevant, reveal very little upon which to assess the determinations before us: whether Appellee wrongfully killed Mrs. Becker and whether his intent or design in doing so was, at least in part, "to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her statements admissible under the forfeiture doctrine." *Giles*, 554 U.S. at 377. From the military judge's factual findings it is very difficult to determine as a preliminary matter, one way or the other, whether Appellee killed Mrs. Becker, let alone whether his act was intentional, and if so, to what end.

Within the extensive record before us, there is evidence upon which to make these critical assessments. Even in the light most favorable to Appellee, who prevailed below, the evidence reveals a number of important facts that are absent from the trial court's ruling, including:

- Two days before her death, Appellee was concerned about Mrs. Becker "making problems" for him upon moving out. While informing the police of his concern, Appellee also reported the problematic effects of

---

[8] App. Ex. LXXIX at 6.

Mrs. Becker's alcohol consumption, yet bought a bottle of wine for their apartment that same day.

- A day or so before Mrs. Becker's death, Appellee retrieved pills from his old office matching the physical description of prescription pills containing the same sedative later found in Mrs. Becker's system.

- Just prior to Mrs. Becker's death, text messages evidencing her ostensible desire to get back together with Appellee, but being distraught about being rejected by him, were sent from Mrs. Becker's phone to her new boyfriend, at times when Appellee was not using his own phone.

- Appellee told the police he heard only an initial scream from Mrs. Becker's bedroom before arriving just in time to see her go out the window, whereas multiple bystanders heard Mrs. Becker repeatedly and fearfully crying for help, saw her struggling to hold onto a window ledge for a period of time before falling, and then saw him looking down from the window to where she fell, which he denied.

- Two days after Mrs. Becker's death, Appellee was still thinking and talking about the "living nightmare" she had caused when she reported he had assaulted and strangled her in the Army hotel in August 2013.

- In addition to being investigated previously for assaultive conduct toward Mrs. Becker—which he considered harmful to his career—at the time of her death Appellee had an ongoing child custody dispute over children from a previous marriage, which he feared would be negatively impacted by even the report that Mrs. Becker had committed suicide or accidentally fallen.

- Among the things Mrs. Becker revealed to friends and family members about her abusive marriage was her fear of what Appellee would do if he lost his career.

Within the broader context discussed *supra*, these more immediate circumstances of Mrs. Becker's death support by a preponderance of the evidence not only that (1) Appellee intentionally killed Mrs. Becker, but that (2) his actions were the result of planning and calculation, and that (3) at least part of his intent was to prevent Mrs. Becker from causing him any more problems akin to the "living nightmare" she had caused him when she reported her prior allegations of abuse to the authorities. Unlike the homicide

in *McKelton*, which the prosecution viewed as spontaneous, the evidence of premeditation in this case supports that the wrongful act was motivated by more than just possible "jealousy over Mrs. Becker's relationship with another man," as the military judge found.[9] The evidence of planning and premeditation supports that in killing Mrs. Becker, Appellee was motivated not just to rid himself of any visceral feelings of jealousy upon finding her in a second affair, but by a desire to be rid of her in a complete sense, to include the incriminating detritus of his prior abusive conduct.

While we recognize that even premeditated murder can be motivated by pure jealousy, evidence that the wrongdoing rendering the declarant unavailable was committed after reflection by a cool mind dramatically increases the need to thoroughly examine, for purposes of forfeiture by wrongdoing, whether multiple layers of motive and intent were at play. And the focus of the assessment is not on what the declarant was doing or thinking at the time, but on the subjective intent of the wrongdoer, as evidenced by his conduct.

In this case, had the evidence suggested Appellee angrily killed Mrs. Becker close in time to when he found out about her new boyfriend, we might well agree with the trial court's conclusion that Appellee was motivated exclusively by jealousy. But Appellee had known about Mrs. Becker's new relationship for weeks by the time of her death on 8 October 2015. He had been sleeping apart from her, signed a separation agreement with her, and knew that she was spending nights at her boyfriend's house and looking for her own apartment to live in with their daughter. Yet everything appeared to be flowing amicably toward establishing separate households and living apart. So what changed in the days leading up to her death? In arguing over who could enter his house to help her move out, she said something about "causing him problems" that made him concerned enough to go to the police, where he reported she was an emotional drunk, yet bought wine, and then scrounged for pills apparently containing the sedative later found in her body.

Here is where, in addition to the broader context, the immediate circumstances of Mrs. Becker's death become all important to answer the question *Giles* requires: not what was the declarant's intent at the time of the wrongdoing, but what was the wrongdoer's? The Government argues that from prior experience Appellee knew one way in which Mrs. Becker could indeed cause him problems—to his career, to his ongoing child custody dispute, and to him personally—was by reporting (or re-reporting) his abusive conduct,

---

[9] App. Ex. LXXXIII at 2.

which though she formally recanted she never stopped talking about with friends and family members. And so, in order to avoid another "living nightmare," Appellee hatched a scheme to kill Mrs. Becker, which he then carried out.

We need not determine whether based on this theory the Government can prove premeditated murder beyond a reasonable doubt at trial. That is for the fact-finder to decide. But for purposes of determining what evidence it may use in its case, we find the Government has shown by a preponderance of the evidence that one may reasonably infer such a design was at least part of Appellee's intent in killing Mrs. Becker.[10] We conclude that while otherwise reasonable in its approach to the evidence, in not taking into account the more immediate circumstances of Mrs. Becker's death, the trial court erred in failing to consider important facts supporting not only that Appellee intentionally killed Mrs. Becker, but the full nature of his reasons for doing so. Based on the totality of the circumstances in this case—including the above-described facts not considered by the trial court—we conclude that "[Appellee's] wrongful act [wa]s performed with an intent to prevent [Mrs. Becker] not only from testifying at some formal proceeding, but also from reporting abuse, cooperating with law enforcement, or resorting to outside help." *Becker I*, 80 M.J. at 569.

## III. CONCLUSION

The Government's appeal is **GRANTED**. The military judge's ruling is **VACATED**, and the statements at issue are ruled admissible under the forfeiture-by-wrongdoing exception to the Confrontation Clause and Military Rule of Evidence 806(b)(6). The record of trial is returned to the Judge

---

[10] We respectfully disagree with our dissenting colleague that in so holding we are establishing a policy whereby criminal defendants are subject to a different Confrontation Clause than everyone else. Indeed, the forfeiture-by-wrongdoing exception applies equally to the Government. Fed. R. Evid. 804(b)(6) advisory committee's note to 1997 amendment ("The rule applies to all parties, including the government."). Nor do we agree that we have somehow established a new rule for Sailors and Marines that differs from that of our sister services, for which the dissent cites no cases from our sister service courts or the Court of Appeals for the Armed Forces and we are aware of none. Rather, the forfeiture-by-wrongdoing exception applies equally to all servicemembers, whether they commit the wrongdoing that renders declarants unavailable as witnesses or are themselves the declarants silenced by such wrongful acts.

Advocate General for remand to the convening authority and delivery to the military judge for further proceedings in light of this opinion.

Judge STEWART concurs.

STEPHENS, Senior Judge (dissenting):

I am unable to join my colleagues for three reasons. First, the evidence does not demonstrate that Appellee had some secondary motive to prevent his wife from making future testimonial statements. Second, the military judge did not abuse his discretion by not making findings on facts that were, in context, unimportant. Third, the majority does precisely what the Supreme Court warned us not to do in *Giles*, which is to establish a policy where criminal defendants—in this case Marines and Sailors—would be subject to a different Confrontation Clause than everyone else.

## DISCUSSION

### A. The Majority's Facts Are Not Evidence of Appellee's Secondary Intent to Prevent Mrs. Becker from Making Future Testimonial Statements

The majority lists various facts in concluding that Appellee *must have* had a secondary motive in mind. None of them alone is dispositive to show his specific intent to prevent Mrs. Becker from making future testimonial statements. Even considered as a totality, these items are just a list of non-dispositive facts.

Two days before Mrs. Becker's death, Appellee went to the Belgian police and made an unusual pre-emptive complaint about his wife. He told them that he was concerned about her friends—including her new boyfriend—who were coming to assist with her moving her things from their shared apartment. He told police he "did not want a confrontation."[1] Appellee also told the police that Mrs. Becker "made me understand that she was going to cause me problems"[2] if she was unable to have her own friends help her with the move. This is much more readily viewed as an expression that Mrs. Becker could cause Appellee social or personal problems pertaining to the move, rather than some veiled threat of re-igniting the 2013 allegation by making future testimonial statements to law enforcement.

Two days after Mrs. Becker's death, Appellee spoke with one of her friends from home. He told her that Mrs. Becker made his life a "living

---

[1] Appendix H, Govt. Ex. 25 at 40.

[2] *Id*.

nightmare"[3] when she made the 2013 allegation. This statement strikes me as a candid reflection that Mrs. Becker's 2013 allegation, whether accurate or not, caused significant personal and professional problems for Appellee. Any service-member who was the subject of an allegation of spousal abuse could believe the allegations were making his life a "living nightmare." This is probably especially true if years-old and recanted allegations were re-ignited. A service-member would be unlikely to forget that and could have that in the back of his mind for years. But that circumstance does not rise to the level of demonstrating Appellee's subjective intent to prevent Mrs. Becker from making future testimonial statements. That circumstance could apply to every service-member who was the subject of past spousal abuse allegations.

The majority asserts that all of the above facts go to "motive, which is the heart of the matter" before this Court. The motive the majority appears to concentrate on is the motive to commit premediated murder. But the motive we are actually concerned about is a secondary motive to prevent Mrs. Becker from making future testimonial statements. In my view none of the facts, taken individually, or as a whole, show Appellee had such a secondary motive.

This should be a simple analysis where a military judge can make a finding of fact that demonstrates such an intent. It should not require layering or synthesis of different pieces of evidence. For example, in *United States v. Jackson*,[4] cited by the majority, the evidence demonstrated that the appellant orchestrated the murder of the decedent to prevent his future testimony in the appellant's attempted murder trial. The testimonial statements the decedent made to the police concerned a previous attempt on his life and the appellant's involvement in that attempt. The evidence showed the appellant learned the decedent was "telling everything" to the police and, in response, the appellant told his associates the decedent was "an informant trying to bring down him and his brothers" and that he "deserved" to be killed.[5] *Jackson* has clarity and quantum of evidence that far exceeds the evidence in this case.

The Government urged us to consider three civilian cases for the proposition that Appellee had a secondary motive: *State v. McKelton*,[6] a 2016 opinion

---

[3] Govt. Ex. 28 at 3, 7.

[4] 706 F.3d 264 (4th Cir. 2013).

[5] *Id.* at 266.

[6] 70 N.E.3d 508 (Ohio 2016).

from the Supreme Court of Ohio; *People v. Kerley*,[7] a 2018 opinion from a California Court of Appeal; and *McLaughlin v. Steele*,[8] a 2016 habeas petition from the Eastern District of Missouri. In my view, all of these cases undermine the Government's and the majority's position.

*McKelton*, cited by the majority, featured overt evidence of the appellant preventing testimonial statements about on-going domestic abuse that occurred within just three months of the conduct leading to unavailability. McKelton murdered his girlfriend, with the state's theory being that the killing "was spontaneous" and "wasn't planned."[9] The Supreme Court of Ohio, as the majority points out, held that "the immediate circumstances" of the victim's death did not "establish the requisite purpose that would allow the admission of testimonial statements because of forfeiture by wrongdoing."[10]

The majority contrasts the spontaneous murder in *McKelton* with the allegedly planned murder here. In *McKelton* the court was still able to find a purpose to prevent future testimonial statements, and thus forfeiture by wrongdoing, even in the absence of a pre-planned intent to murder. Following the majority's logic here, if a spontaneous killing can discern a motive to silence, then a planned one *must* also have such a motive. I disagree with this rationale in general, but specifically, the nature of the evidence in *McKelton* is in such stark contrast with the evidence here. McKelton lived with his girlfriend and her two minor nieces. McKelton had once taken a phone from one of the girls as she was trying to call 911 when he was assaulting her aunt. At a later date, he became enraged when the other niece called 911 and a police officer came to the house. Three months later, the girls' aunt was dead. Despite the death appearing to be a spontaneous killing, the Supreme Court of Ohio, applying *Giles* and looking at the domestic abuse circumstances generally, held that McKelton was "trying to isolate [his victim] and prevent her from talking to authorities."[11]

In *Kerley*, cited by the Government, the appellant had a long and extremely violent relationship history with his victim. This included overt warnings to her that he would kill her if she went to the police. But at the time of his victim's disappearance, Kerley was just days away from a court

---

[7] 233 Cal. Rptr. 3d 135 (Cal. Ct. App. 2018).

[8] 173 F. Supp. 3d 855 (E.D. Mo. 2016).

[9] *McKelton*, 70 N.E.3d at 545.

[10] *Id.* at 546.

[11] *Id.*

appearance for felony assault of his victim. Not only was the abuse contemporaneous with the wrongdoing causing the unavailability, but the victim "obviously would have been the key witness against him."[12] The same is true of *McLaughlin* and its background of contemporaneous domestic abuse. McLaughlin was pending "ongoing burglary and abuse cases"[13] where his victim's testimony was crucial.

The majority's remaining facts fare no better in shedding light on Appellee's subjective intent. The Appellee obtained pills that he possibly used to sedate Mrs. Becker and there was a discrepancy between his statements to the police about Mrs. Becker's scream and the statements of witnesses. Neither of these facts demonstrate Appellee's secondary purpose. They merely demonstrate some design of Appellee to kill Mrs. Becker or to obfuscate his role in her death.

The majority also cites as an important fact that Appellee's ongoing child custody dispute [from a previous marriage] could be jeopardized by the fact of Mrs. Becker's suicide or death by accident. In so doing, it cites a 2017 opinion from the Supreme Court of Illinois, *People v. Peterson*,[14] that forfeiture by wrongdoing can apply if there is some civil matter in play, too. And that is true. But the facts of *Peterson* show a clear case of an appropriate application of the exception and further demonstrate a stark contrast from the majority's holding here.

Peterson was in the middle of an acrimonious divorce. He stated he was adamant that his ex-wife not receive any of his pension from the police department and they were bitterly opposed over custody of their sons. His ex-wife was scared for her safety and extracted a promise from her sister to look after her sons if something should happen to her, because she was convinced she might not make it to the hearing where she would have to testify. In addition, Peterson made statements to a friend that his ex-wife needed to be "taken care of" because "she has something on me" and offered $25,000 for the act.[15] Finally, Peterson, with his ex-wife "taken care of," received sole custody of the children, had to pay no alimony or child support, received the total of the proceeds of the sale of their home, obtained sole control of a business, and did not have to sever any of his pension. This is what motive

---

[12] *Kerley*, 233 Cal. Rptr.3d at 173.

[13] *McLaughlin*, 173 F.Supp. 3d at 901.

[14] 106 N.E. 3d 944 (Ill. 2017).

[15] *Id.* at 962.

and intent, "inferred from conduct and the surrounding circumstances"[16] looks like. In contrast, Appellee and Mrs. Becker's divorce was, as Mrs. Becker told her friends, "amicable."[17] They intended to continue with a joint business venture selling athletic gloves[18] and had a mutual arrangement to share custody of their baby daughter.[19]

With no evidence of any future criminal proceedings or testimony, we are left with considering whether there is any evidence of Appellee's subjective intent to prevent Mrs. Becker from making future testimonial statements. While it is true that the intent does not have to be reasonable or objective, but merely exists in Appellee's mind, it would certainly be a factor to consider as to whether there was objective evidence outside of Appellee's subjective intent. In short, if there was some objective evidence that Mrs. Becker was intending to make future testimonial statements, this would probably assist the factfinder in discerning Appellee's subjective intent. Here, there is no objective evidence of such intent by Mrs. Becker. This does not by itself mean that Appellee did not have a subjective intent, it just means that his intent appears to drift into an unreasonable one. The majority thus engages in collecting evidence to discern Appellee's unreasonable, subjective intent to prevent Mrs. Becker from making future testimonial statements, where no evidence shows she was planning to do so in the first place.

## B. The Military Judge Did Not Fail to Consider Important Facts

I believe we owe more deference to the military judge. We specifically directed the military judge to consider Appellee's subjective intent when we remanded the matter. And he concluded that the evidence failed to establish that Appellee "believed that such formal or informal reporting was going to occur, then or in the future."[20] The facts that the majority characterizes as "important facts" were thus in front of the military judge, twice. He is not required to make findings on every possible factoid placed in front of him. "A

---

[16] *Id.* at 961 (citations omitted).

[17] R. at 66; App. Ex. LXXIX at 3-4, Military Judge's Findings of Fact and Conclusions of Law dated 9 Dec 2019 [from first Article 39(a) session] at 5.

[18] *Id.*

[19] R. at 10.

[20] App. Ex. LXXXIII, Military Judge's Findings of Fact and Conclusions of Law dated 10 Aug 2020 [from second Article 39(a) session] at 3.

military judge abuses his discretion when . . . he fails to consider important facts."[21]

The question is not whether we merely disagree with the military judge's assessment of the evidence, but whether the facts identified by the majority were important enough to render a failure to make findings on them an abuse of discretion. First, these facts were in front of the military judge in the first Article 39(a) hearing on this issue. And when this Court heard the Government's first Article 62 appeal, we remanded the case because the military judge had applied a "legal principle" we held to be "incorrect"[22] [focusing on the "reasonable foreseeability" of future testimony or proceedings rather than the subjective belief and intent of Appellee to prevent future testimony or testimonial statements]. We said nothing at the time about the military judge's failure to consider important facts. Should he have considered this Court's silence on that issue to be our consent or does this Court have the latitude to change its reasons to find abuse of discretion upon a subsequent interlocutory appeal?

The second concern is how central these facts were, in context. An example of an important fact that a military judge overlooked is from the case cited by the majority, *United States v. Commisso*.[23] In that case, members convicted the appellant of a sexual assault contrary to his pleas. Three of the members, one lieutenant colonel and two colonels, had actually regularly attended Sexual Assault Review Board [SARB] meetings where this case had been briefed and discussed from the victim's point of view. None of them answered accurately during voir dire whether they knew anything about the case. During the trial, one of the colonels reminded the lieutenant colonel that they had heard about the appellant's case at the SARB. After the trial, at the SARB, one of the colonels recommended the briefing method be changed to allow for better objectivity in the future for court-martial members attending the SARB. At the same SARB, the colonel made negative statements about those accused of sexual assault and also of defense counsel who represent them. At a post-trial hearing, the military judge denied the defense motion for a mistrial due to member bias. The Court of Appeals for the Armed Forces held that he failed to consider any implied bias from the members' SARB participation, the colonel's "explicitly negative statements at

---

[21] *United States v. Commisso*, 76 M.J. 315 (C.A.A.F. 2017).

[22] *United States v. Becker*, 80 M.J. 563, 569 (N-M. Ct. Crim. App. 2020) [*Becker I*].

[23] 76 M.J. 315.

the SARB regarding those who serve as defense counsel and those who are accused of sexual assault" or the "cumulative appearance" of these three members sitting on the appellant's panel.[24] These were "elephant-in-the-room" facts that were left unaddressed by the military judge.

In my view, there is no comparison of the "important facts" from *Commisso* to Appellee's case. The abuse of discretion in *Commisso* is readily apparent in a way that renders the result "arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[25] The majority's elevation of these facts—which were before the military judge both times in the same manner—to "important facts" concerning Appellee's secondary motive akin to *Commisso* makes the holding here look more like a "mere difference of opinion."[26] I believe we owe the military judge more deference and that these facts did not rise to the level of "important facts."

## C. This Court Effectively Overrules *Giles v. California*

In *Giles*, the Court rejected the notion that there is "one Confrontation Clause (the one the Framers adopted and *Crawford* described) for all other crimes, but a special, improvised, Confrontation Clause for crimes that are frequently directed against women."[27] The majority holds that Appellee, due to his meticulous planning of Mrs. Becker's murder, must have known that by doing so, she would never be able to testify, or provide future testimonial statements against him, if she were not alive. This is in accord with the dissent in *Giles*: "[u]nder the circumstances presented by this case, there is no difficulty in demonstrating the defendant's intent. This is because the defendant here knew that murdering his ex-girlfriend would keep her from testifying; and that knowledge is sufficient to show the *intent* the law ordinarily demands."[28] Lest we draw any distinction between the more spontaneous killing in *Giles* and the planned killing here, the law recognizes that motive and intent can be demonstrated in an instant and by one's actions. If the *Giles* dissent would find intent in a spontaneous killing because "any reasonable person would have known"[29] that a murder victim could not make

---

[24] *Id.* at 320.

[25] *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010).

[26] *Id.*

[27] *Giles*, 554 U.S. at 376.

[28] *Id.* at 385 (Breyer, J., dissenting) (emphasis in the original).

[29] *Giles*, 554 U.S. at 386 (Breyer, J., dissenting).

any future testimonial statements or provide testimony, then it would also find that same intent in a planned murder as well. But that is not the law and that is not the holding in *Giles*.

With respect to intent to make the victim unavailable, the distinction between this case and the underlying facts of *Giles* is one without much difference. And the fact that the dissent in *Giles*, if it were the majority opinion, would provide an easy explanation for the result in this case, leads me to believe we are wrong. The majority's collection of statements appears to me to be speculative. Evidence of intent can be "circumstantial evidence-from before or after the act."[30] And while circumstantial evidence can certainly be dispositive, there is a distinction between speculation and circumstantial evidence. Speculation is "the art of theorizing about a matter to which evidence is not sufficient for certain knowledge"[31] while circumstantial evidence is the "process of decision by which court or jury may reason from circumstances known or proved, to establish by inference the principal fact."[32] Here, I believe the circumstantial evidence is leagues apart from the proverbial wet street in the morning or the deer tracks in freshly fallen snow that are standard examples of circumstantial evidence.

*Giles* tells us that we must find evidence that the purpose of the accused's actions was, in part, to prevent future testimony or future testimonial statements. As much as one may agree with the sentiment of the dissent in *Giles* concerning the appearance of forfeiture by wrongdoing [or its lack thereof] in domestic abuse cum murder cases, the Court's holding was clear: there must be evidence that an accused intended to prevent future testimony or future testimonial statements. The forfeiture by wrongdoing "exception is not available for statements by murder victims simply because the defendant made them unavailable."[33]

Finally, the most concerning problem with the majority's holding is that Marines and Sailors who are accused of crimes will now be subject to a different Confrontation Clause than civilians, or even members of our sister

---

[30] *United States v. Rodriguez*, 79 M.J. 1, 4 (C.A.A.F. 2019) (citing *United States v. Acevedo*, 77 M.J. 185, 189 (C.A.A.F. 2018)).

[31] *United States v. Cage*, 42 M.J. 139, 145 (C.A.A.F. 1995) (Sullivan, CJ, dissenting) (citing *Black's Law Dictionary* (6th ed. 1990).

[32] *Id.*

[33] *United States v. Burgos-Montes*, 786 F.3d 92, 115 (1st Cir. 2015) (citing *Giles*, 554 U.S. at 367-77).

services. There do not appear to be any cases from CAAF or our sister service courts that are directly on point to support the majority's position [or in fairness, my own]. However, the majority's position appears to contradict *Giles*, or at the very least follow the logic of its dissent. While the Navy and Marine Corps do not see many courts-martial for murder, when they arise they often come in the context of messy, violent, and failed romantic relationships. Evidence of any premeditation at all, or even borrowing from the dissent in *Giles*, just the simple logic that every assailant knows the dead cannot testify or provide future testimonial statements, means that any prior testimonial statements of domestic abuse, will now be available for the government to use at trial without the accused having the benefit of cross examination. Because I believe the Confrontation Clause, and *Giles,* requires the government to present better evidence than this showing that a purpose of the wrongdoing was to prevent future testimony or future testimonial statements, I dissent.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court